# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| AITHENT, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )   **Case No.: 4:11-CV-00173-GAF** |
| vs. | ) |
| | ) |
| NATIONAL ASSOCIATION OF INSURANCE | ) |
| COMMISSIONERS, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S SUGGESTIONS IN SUPPORT OF ITS MOTION IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT ON DAMAGES

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

SUMMARY JUDGMENT STANDARD............................................................................. 8

ARGUMENT AND AUTHORITIES.................................................................................. 9

    I.      LIMITATION OF LIABILITY PROVISIONS ARE REGULARLY
           ENFORCED BY NEW YORK COURTS.................................................... 9

    II.    AITHENT'S AGGREGATE DAMAGES ARE LIMITED TO A SIX-
           MONTH WINDOW OF TIME ................................................................ 12

    III.   AITHENT'S DAMAGES ARE LIMITED .............................................. 14

          A.     THE AGGREGATE AMOUNT OF EACH PARTY'S
                 LIABILITY................................................................................. 14

          B.     THE EVENT GIVING RISE TO SUCH CLAIM......................... 15

          C.     APPLICABLE TO THE STATE FOR WHICH SUCH CLAIM
                 ARISES........................................................................................ 17

    IV.   THIS IS THE EQUITABLE RESULT..................................................... 18

CONCLUSION AND RELIEF SOUGHT ...................................................................... 21

CERTIFICATE OF SERVICE ......................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

Awards.com v. Kinko's, Inc.,
  834 N.Y.S.2d 147 (App. Div. 2007) .......................................................................... 19

Damin Aviation Corp. v. Sikorsky Aircraft,
  705 F. Supp. 170 (S.D.N.Y. 1989) ............................................................................ 10

DynCorp v. GTE Corp.,
  215 F. Supp. 2d 308 (S.D.N.Y. 2002) ............................................................ 10, 11, 12

F.D.I.C. v. Bell,
  106 F.3d 258 (8th Cir. 1997) ...................................................................................... 8

Feature Enters., Inc. v. Cont'l Airlines,
  745 F. Supp. 198 (S.D.N.Y. 1990) ............................................................................ 11

Gold Connection Discount Jewelers, Inc. v. Am. District Telegraph Co., Inc.,
  622 N.Y.S.2d 740 (App. Div. 1995) .......................................................................... 16

Hartford Accident and Indemnity Co. v. Fireman's Ins. Co. of Newark, N.J.,
  536 N.Y.S.2d 260 (App. Div. 1989) .......................................................................... 14

Indus. Risk Ins. v. Port Auth. of N.Y. & N.J.,
  387 F. Supp. 2d 299 (S.D.N.Y. 2005) ............................................................ 10, 11, 12

Kalisch-Jarcho, Inc. v. City of New York,
  58 N.Y.2d 377 (1983) ............................................................................................ 9, 12

Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.,
  643 N.E.2d 504 (N.Y. 1994) ..................................................................... 9, 11, 12, 20

MyPlayCity, Inc. v. Conduit Ltd.,
  2011 WL 3273487 (S.D.N.Y. July 29, 2011) ............................................................ 14

Nat'l State Bank v. Am. Home Assurance Co.,
  492 F. Supp. 393 (S.D.N.Y. 1980) ............................................................................ 14

Rector v. Calamus Group, Inc.,
  794 N.Y.S.2d 470 (App. Div. 2005) .......................................................................... 11

Ruttenburg v. Davidge Data Sys. Corp.,
  626 N.Y.S.2d 174 (App. Div. 1995) .............................................................. 12, 14, 19

UnitedHealth Group, Inc. v. Wilmington Trust Co.,
  548 F.3d 1124 (8th Cir. 2008) .................................................................................... 8

Westinghouse Elec. Corp. v. N.Y. Transit Auth.,
  623 N.E.2d 531 (N.Y. 1993) ..................................................................................... 20

## TREATISES

5 Corbin, CORBIN ON CONTRACTS ........................................................................ 9, 11, 20

Case 4:11-cv-00173-GAF   Document 89   Filed 01/14/13   Page 3 of 27

## ADDITIONAL AUTHORITIES

BLACK'S LAW DICTIONARY (6th Ed. 1990) ...................................................................... 14

## <u>INTRODUCTION</u>

Defendant National Association of Insurance Commissioners ("NAIC") is entitled to partial summary judgment on the issue of Plaintiff Aithent's alleged damages stemming from Counts I-III and V.[1]   NAIC and Aithent—each a sophisticated party represented by counsel—entered into a software license agreement ("Agreement") which contains a clear, bilateral, limitation of liability provision.  This Court must now enforce that provision.[2]

The only question to be determined by this motion is the *maximum limit* of Aithent's potential damages.  This determination is governed by the terms of the Agreement, the validity of which is not in dispute.  The express terms of the Agreement limit Aithent's aggregate recovery, on a per-state basis, to the royalties received and owed from each particular state during the preceding six-month window of time.

However, Aithent's lawsuit essentially seeks **<u>ten years</u>** of damages—twenty times the amount limited by the Agreement.[3]  Aithent has no basis for ignoring the clear terms of the Agreement.  As such, the limitation of liability within the Agreement should be

---

[1] Count IV is the only count not subject to this motion.  NAIC moved for summary judgment on Count IV (Doc. 78) and Aithent has to date failed to oppose the motion.  The Court has ordered Aithent to show cause as to why it has not responded.  To date, Aithent has not responded to the Court's Show Cause Order. (Doc. 79).  Nevertheless, as discussed in NAIC's motion for summary judgment on Count IV, that count is based on a separate agreement which has its own liquidated damages provision.  Consequently, Count IV is not addressed in this motion.

[2] This Motion in the Alternative assumes, for purposes of argument, that Aithent can somehow prevail on one of its claims alleged in Counts I-III and V.  NAIC has also filed for summary judgment on all of these claims as they are each unsupportable on their individual merits (or lack thereof).  For purposes of judicial efficiency, this motion need only be considered <u>if</u> NAIC's motions on 1) Counts I, II and V and 2) Count III are denied in whole or in part.  If NAIC is granted summary judgment on those claims, this Motion becomes moot.

[3] A portion of Aithent's claims have now been dismissed by this Court based on the statute of limitations.

1

respected and it should be enforced. There are no material facts in dispute. NAIC now

seeks a purely-legal determination from this Court.

## STATEMENT OF FACTS

**Background[4]**

1. Plaintiff Aithent is incorporated in New York State and has its principal place of business at 75 Maiden Lane, New York, NY 10038. Complaint, ¶ 12, attached hereto as Exhibit 1.

2. Mr. Venu Gopal is Chief Executive Officer of Aithent. Deposition of Venu Gopal pursuant to Rule 30(b)(6), attached hereto as Exhibit 2, 11:18-20.

3. The National Association of Insurance Commissioners is an association comprised of the principal insurance regulatory officials of each of the 50 states plus the District of Columbia and U.S. territories. Ex. 1, ¶ 4.

4. Aithent developed a software product called Licensing Environment Online ("LEO"). Ex. 1, ¶ 3.

5. NAIC intended to use LEO as the "basis for development" for NAIC's software system called State-Based Systems ("SBS"). License Agreement attached hereto as Exhibit 3, p.1 ("Agreement").

6. Aithent and NAIC entered into a License Agreement to use LEO in July 2002. Ex. 3.

7. Under the terms of the Agreement, NAIC received an exclusive license to use LEO as the "foundation in the development, implementation, operation, maintenance, and enhancement of SBS." Ex. 3.

---

[4] Facts Number 1-17 are provided for purposes of providing context to the Court. Some of these facts may be in dispute but they are not material to the underlying motion which is a pure question of law.

8. In return, NAIC agreed to pay monthly royalties to Aithent, constituting 50% of fees paid for certain electronic transactions occurring "in or through SBS." Ex. 3.

9. These transactions "in or through SBS" occurred only for individual states that licensed SBS from NAIC. Ex. 3; Deposition of Julienne Fritz of NAIC pursuant to Rule 30(b)(6), attached hereto as Exhibit 4 at 212:8-11, 258:17-20.

10. For a portion of the SBS transactions, some transactions were submitted through pre-existing software created by NAIC's affiliate NIPR and called "Gateway." Ex. 2 at 113:1-11, 115:18-20, 121:6-10, 177:19-22.

11. NIPR's Gateway was developed for "front-end processing" of certain insurance transactions. Ex. 2 at 121:6-10.

12. If a particular state utilized NIPR's Gateway and licensed SBS, transactions in that state could be submitted through Gateway and then sent to the state to be processed by SBS. Ex. 2 at 182:23-183:5.

13. Whether SBS transactions went through Gateway or not, if the transaction (listed in Exhibit A of the Agreement) was processed by SBS in a state that licensed SBS, Aithent was paid its full royalty. Ex. 2 at 182:14-183:5, 280:4-8.

14. However, not every state that utilized Gateway also licensed SBS. A number of states never licensed SBS, but instead built their own systems or licensed a system from a competitor. NAIC's Answer and Counterclaim, Doc. 7, attached hereto as Exhibit 5, p. 14 ¶ 16; admitted by Aithent in Doc. 16, p. 3 ¶ 16, attached hereto as Exhibit 6.

15. Some states chose to use other software programs for handling their producer (agent) licensing submissions after the submissions were initially submitted through Gateway. Ex. 5, p. 14 ¶ 16; admitted by Aithent in Ex. 6, p. 3 ¶ 16.

16. Aithent did not receive royalties for transactions processed for states that did not license SBS. Ex. 4 at 256:8-257:4. For demonstrative purposes, this is depicted in basic terms in the diagram attached hereto as Exhibit 7.

**Agreement Negotiations – July 2001 to July 2002**

17. Aithent was represented by counsel during the negotiations regarding the Agreement. Ex. 2 at 123:4-124:19.

18. Aithent was represented by Mr. Bill Bandon during the negotiations. Ex. 2 at 124:2-6.

19. NAIC was represented by counsel during the negotiations regarding the Agreement. Ex. 2 at 124:7-13.

20. Karen Schutter, in-house counsel for NAIC, represented NAIC during the negotiations regarding the Agreement. Ex. 2 at 124:7-13.

21. Aithent's initial discussions with NAIC's Gary Gummig took place on July 19, 2001. Ex. 2 at 123:4-9.

22. Aithent and NAIC ultimately signed the Agreement on July 15, 2002—nearly one full year later. Ex. 2 at 123:4-12; 124:14-16.

23. Mr. Gopal—testifying as Aithent's corporate representative—testified that during the time between Aithent's original meeting with NAIC in July 2001 and the Agreement's execution in July 2002, there were a great deal of negotiations,

4

discussions, meetings, and communications between Aithent and NAIC. Ex. 2 at 15:19-22; 16:19-23; 123:13-17.

24. Mr. Gopal testified that drafts of the Agreement were passed back and forth between NAIC and Aithent as part of the negotiations. Ex. 2 at 123:18-25.

25. Mr. Gopal testified that he believed the Agreement accurately reflects the entire agreement between NAIC and Aithent. Ex. 2 at 124:17-19.

**26. Limitation of Liability**

27. Section 10(b) of the Agreement is entitled "**LIMITATION OF LIABILITY**." Ex. 3 § 10(b) (emphasis in original).

28. Section 10(b) states in relevant part:

> **b. LIMITATION OF LIABILITY.**
>
> . . . THE **AGGREGATE** AMOUNT OF EACH PARTY'S LIABILITY TO THE OTHER PARTY . . . RESULTING FROM . . . THE . . . BREACH OF THIS AGREEMENT **SHALL IN NO CASE EXCEED** . . . THE **SUMS RECEIVED BY AITHENT AND DUE AND OWING** HEREUNDER BY THE NAIC **FOR THE SIX (6) MONTHS PRECEDING THE EVENT** GIVING RISE TO SUCH CLAIM **APPLICABLE TO THE STATE** FOR WHICH SUCH CLAIM ARISES.
>
> Ex. 3 § 10(b) (emphasis added).

29. Section 10(b) of the Agreement states in full:

> **b. LIMITATION OF LIABILITY.**
>
> AITHENT SHALL NOT BE LIABLE FOR AND THE NAIC EXPRESSLY WAIVES ANY CLAIM FOR ANY INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST SALES, LOST PROFIT, BUSINESS INTERRUPTION, LOSS OF DATA OR LOSS OF OR INABILITY TO USE ANY COMPUTER, SYSTEM, SOFTWARE OR COMPONENT), SUFFERED BY THE NAIC OR ANY THIRD PARTY AS A RESULT OF SUCH PARTY'S RELIANCE ON THE VERSIONS OF LEO, SBS, ANY MODIFICATIONS THERETO, OR ANY SERVICES

5

PERFORMED BY AITHENT UNDER THE MASTER SERVICES AGREEMENT, WHETHER THE SAME ARE INCURRED OR SUFFERED BY THE NAIC OR ANY THIRD PARTY, AND WHETHER BASED IN CONTRACT, TORT OR OTHERWISE.

THE NAIC SHALL NOT BE LIABLE FOR AND AITHENT EXPRESSLY WAIVES ANY CLAIM FOR ANY INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST SALES, BUSINESS INTERRUPTIONS, LOSS OF DATA OR LOSS OF OR INABILITY TO USE ANY COMPUTER, SYSTEM, SOFTWARE OR COMPONENT), SUFFERED BY AITHENT OR ANY THIRD PARTY AS A RESULT OF SUCH PARTY'S RELIANCE ON THE VERSIONS OF LEO, SBS, ANY MODIFICATIONS THERETO, OR ANY SERVICES PERFORMED BY THE NAIC, WHETHER THE SAME ARE INCURRED OR SUFFERED BY AITHENT OR ANY THIRD PARTY, AND WHETHER BASED IN CONTRACT, TORT OR OTHERWISE.

IN ADDITION, EXCEPT FOR EACH PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER, THE AGGREGATE AMOUNT OF EACH PARTY'S LIABILITY TO THE OTHER PARTY OR ANY THIRD PARTY UNDER ANY CLAIM FOR LOSS OR LIABILITY BASED UPON, ARISING OUT OF, RESULTING FROM, OR IN ANY WAY CONNECTED WITH THE PERFORMANCE OR BREACH OF THIS AGREEMENT SHALL IN NO CASE EXCEED (A) WITH RESPECT TO AITHENT, THE SUMS RECEIVED HEREUNDER BY AITHENT FROM THE NAIC FOR THE SIX (6) MONTHS PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM APPLICABLE TO THE STATE FOR WHICH SUCH CLAIM ARISES AND (B) WITH RESPECT TO THE NAIC, THE SUMS RECEIVED BY AITHENT AND DUE AND OWING HEREUNDER BY THE NAIC FOR THE SIX (6) MONTHS PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM APPLICABLE TO THE STATE FOR WHICH SUCH CLAIM ARISES.

Ex. 3 § 10(b).

30. Section 14 of the Agreement states that the Agreement will be governed by New York law.  Ex. 3 § 14.

**Aithent's Claims**

31. Aithent filed this lawsuit on February 14, 2011, alleging five different counts against NAIC.  Ex. 1.

6

32. In Count I, Aithent alleges that NAIC breached the Agreement by failing to pay certain royalties allegedly due under the Agreement. Ex. 1 ¶ 39.

33. In Count II, Aithent alleges that NAIC breached the Agreement and the implied covenant of good faith and fair dealing in that NAIC "impeded the development, production and marketing of the LEO-based SBS and improperly prevented Aithent from receiving the benefits of the Agreement." Ex. 1 ¶¶ 41-44.

34. In Count III, Aithent claims that NAIC breached the Agreement by lowering the fees charged for certain electronic transactions without Aithent's consent.[5] Ex. 1¶ 50.

35. In Count V, Aithent alleges that NAIC engaged in unfair competition when it allegedly misappropriated confidential information from Aithent and used the exclusive license of the LEO software, conveyed by the Agreement, to unfairly compete. Ex. 1 ¶¶ 57- 63.

36. Mr. Gopal testified that Aithent is not making a claim that it has been underpaid on royalties for transactions that were processed by states that licensed SBS. Ex. 2 at 280:4-8.

37. Rather, Mr. Gopal testified that Aithent's claims seek payment of royalties for transactions processed through NIPR's Gateway that were processed in states that *did not* license SBS. Ex. 2 at 280:9-14.

38. Mr. Gopal also testified that Aithent's claims seek payment of royalties defined by the Agreement for transactions processed through any web-based system

---

[5] Such a reduction in fees charged would in turn reduce the royalty payment made to Aithent per the terms of the Agreement.

owned by NAIC or NIPR that processes market conduct, solvency, and licensing transactions. Ex. 2 at 127:12-22.

39. Mr. Gopal also testified that Aithent seeks these royalty payments regardless of whether Aithent's exclusively-licensed LEO code was used to process the transactions generating the revenue from which these royalties would be paid. Ex. 2 at 130:5-17.

40. Mr. Gopal also testified that Aithent's claims seek royalty payments on these transactions as of the date the Agreement was signed, even though some of the transactions were being processed by systems previously-developed by NAIC or NIPR without using LEO before the Agreement was executed. Ex. 2 at 362:11-24.

41. Aithent has disclosed that for Counts I, II, and V, all of the damages it is seeking are "royalties calculated under § 6 of the License Agreement." Aithent's Second Supplement to Initial Disclosures, attached hereto as Exhibit 8 at pp. 4-6 ¶¶ a, d.

42. Aithent has disclosed that for Count III, the only damages it seeks are the amounts "Aithent would have earned" under the Agreement, had NAIC not breached the Agreement as described in that count. Ex. 8 at p. 5 ¶ c.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the evidence in the light most favorable to the nonmoving party, there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. F.D.I.C. v. Bell, 106 F.3d 258, 263 (8th Cir. 1997). Purely legal questions of contract interpretation are properly resolved by way of summary judgment. UnitedHealth Group, Inc. v. Wilmington Trust Co., 548 F.3d 1124, 1128 (8th Cir. 2008) (affirming district court's decision granting

summary judgment on issues of contract interpretation and statutory construction). This motion presents just such a question.

## ARGUMENT AND AUTHORITIES

### I. LIMITATION OF LIABILITY PROVISIONS ARE REGULARLY ENFORCED BY NEW YORK COURTS

Aithent and NAIC agreed to each limit their potential liability—and their right of recovery—under the Agreement. Section 10(b) is a *bilateral* limitation of liability provision, freely entered into by two sophisticated parties, each of whom was represented by counsel. SOF ¶¶ 17-20. Such provisions are regularly enforced in New York. In this regard, New York's highest court has stated:

> A limitation on liability provision in a contract represents the parties' Agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, **which the courts should honor**.[6]

In Metropolitan Life, a software license agreement included a provision barring recovery of lost profits, lost savings, and other consequential damages resulting from a party's "performance or nonperformance." Metro. Life Ins., 643 N.E.2d at 506. In applying and enforcing the limitation of liability provision, the New York Court of Appeals—quoting CORBIN ON CONTRACTS—stated:

> Parties sometimes make agreements and expressly provide that they shall not be enforceable at all, by any remedy legal or equitable. They may later regret their assumption of the risks of non-performance in this manner; **but the courts let them lie on the bed they made. Where a contract provides that damages for breach shall not be recoverable beyond a specified sum, it is obvious that the risk of loss beyond that sum is being assumed by the promisee**.[7]

---

[6] Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc., 643 N.E.2d 504, 507 (N.Y. 1994) (emphasis added).

[7] Id. at 507 (quoting 5 Corbin, CORBIN ON CONTRACTS, §1068 at 386) (emphasis added).

According to New York's highest court, courts applying New York law should enforce provisions limiting liability and the let the parties "lie on the bed they made." Id.; *see also* Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 384 (N.Y. 1983) (holding that contractual limitations of liability are enforceable "especially when entered into at arm's length by sophisticated contracting parties"). Moreover, "parties, especially those of equal bargaining power, should be able to rely upon the general New York rule that enforces contracts for the release of claims of liability." Indus. Risk Ins. v. Port Auth. of N.Y. & N.J., 387 F. Supp. 2d 299, 307 (S.D.N.Y. 2005).

It is important to note that this Agreement was the product of two sophisticated parties, each represented by counsel throughout lengthy, arm's-length negotiations. SOF ¶¶ 17-20, 23-24; DynCorp v. GTE Corp., 215 F. Supp. 2d 308, 318 (S.D.N.Y. 2002) (stating "both sophisticated parties represented by sophisticated counsel, unambiguously provided the limit of recovery in the event of breach, and *I may not rewrite how the parties defined their rights* and obligations, allocated their risks, *and limited their liabilities and rights of recovery.*" (emphasis added)). Both NAIC and Aithent were ably represented by their respective lawyers, Aithent by Bill Bandon and NAIC by Karen Schutter. SOF ¶¶ 17-20. Numerous drafts of the Agreement were passed back and forth between Aithent and NAIC. SOF ¶ 24. After nearly one full year of negotiations, the parties finalized the Agreement. SOF ¶ 22. This was a commercial agreement, negotiated over the course of a year, with substantial involvement from counsel on both sides. Aithent's CEO has testified that the Agreement accurately reflects the entire agreement between the parties. SOF ¶ 25.

The limitation provision at issue was not buried in the small print of the Agreement. Rather, it was featured prominently, in all capital letters, under the bolded heading "**LIMITATION OF LIABILITY**." Ex. 3, § 10(b) (emphasis in original). Section 10 is the <u>only</u> section in the Agreement that is presented entirely in capital letters. This section was obviously important to the parties and it was clearly meant to stand apart from the rest of the Agreement. *See generally* <u>Damin Aviation Corp. v. Sikorsky Aircraft</u>, 705 F. Supp. 170, 177 (S.D.N.Y. 1989) (stating plaintiff cannot "contend that the clauses excluding liability for consequential damages were 'lost in a linguistic maze' or were a surprise. The type in [defendant's] clause was bold-faced and capitalized, and [the] entire warranty is only one page long."); <u>Rector v. Calamus Group, Inc.</u>, 794 N.Y.S.2d 470, 471 (App. Div. 2005) (enforcing limitation of liability that was stated "in bold capital letters" and referring to the provision as a "clear contractual provision limiting damages"); <u>Feature Enters., Inc. v. Cont'l Airlines</u>, 745 F. Supp. 198, 200-01 (S.D.N.Y. 1990) (enforcing limitation of liability and noting "bold-faced capitalized caption" on limitation provision).

Additionally, this is not a case where one party struck a better deal for itself. *Both parties* are bound by the limitations of Section 10(b). Ex. 3, § 10(b) (stating "THE AGGREGATE AMOUNT OF EACH PARTY'S LIABILITY TO THE OTHER PARTY . . ."). There is no basis for either party to back away from this agreement now or for the Court to "rewrite how the parties . . . limited their liabilities and rights of recovery." <u>DynCorp</u>, 215 F. Supp. 2d at 318.

Like the parties in <u>Metropolitan Life Insurance</u>, NAIC and Aithent have agreed "that damages for breach shall not be recoverable beyond a specified sum," in this case,

the royalties paid and owed for the six months prior to the event giving rise to the claim (per applicable state). Metro. Life Ins., 643 N.E.2d at 506 (quoting 5 Corbin, CORBIN ON CONTRACTS, § 1068 at 386); Ex. 3 § 10(b). As such, the risk for Aithent's damages beyond that six month window has been assumed by Aithent. The parties were of equal bargaining power and NAIC should be able to rely upon the general New York rule enforcing limitations of liability. Indus. Risk Ins., 387 F.Supp.2d at 307. This Court should enforce this limitation and let the parties lie on the bed they made.

## II.     AITHENT'S AGGREGATE DAMAGES ARE LIMITED TO A SIX-MONTH WINDOW OF TIME

New York courts regularly enforce limitation of liability provisions akin to Section 10(b) of the Agreement. Metro. Life Ins., 643 N.E.2d at 506; Kalisch-Jarcho, 58 N.Y.2d at 384; Indus. Risk Ins., 387 F.Supp.2d at 307; DynCorp, 215 F. Supp. 2d at 318. The only remaining question is what effect that provision has on Aithent's claims.

Such a determination is "a question of law for the court to be made without resort to extrinsic evidence." Ruttenburg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174, 175 (App. Div. 1995). Furthermore, a court "should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." Ruttenburg, 626 N.Y.S. at 177 (internal quotations and ellipses omitted). Instead, an "interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation." Id.

To determine the applicability of Section 10(b) to Aithent's claims, we must again look at the language the parties chose to include in Section 10(b), which states in relevant part:

.  .  .  **THE AGGREGATE AMOUNT OF EACH PARTY'S LIABILITY TO THE OTHER PARTY** .  .  . ARISING OUT OF,

RESULTING FROM, OR IN ANY WAY CONNECTED WITH THE PERFORMANCE OR BREACH OF THIS AGREEMENT **SHALL IN NO CASE EXCEED** . . . (B) **WITH RESPECT TO THE NAIC, THE SUMS RECEIVED BY AITHENT AND DUE AND OWING HEREUNDER BY THE NAIC FOR THE SIX (6) MONTHS PRECEDING THE EVENT** GIVING RISE TO SUCH CLAIM APPLICABLE TO THE STATE FOR WHICH SUCH CLAIM ARISES.[8]

The provision is broken down thusly:

1. "THE AGGREGATE AMOUNT OF [NAIC'S] LIABILITY TO [AITHENT] (i.e., Aithent's *total* damages regardless of the number of claimed breaches);

2. "RESULTING FROM OR IN ANY WAY CONNECTED WITH THE PERFORMANCE OR BREACH OF THIS AGREEMENT" (i.e., stemming from any and all breaches);

3. "SHALL IN NO CASE EXCEED" (i.e., is absolutely limited to);

4. "THE SUMS RECEIVED BY AITHENT" (i.e., royalties actually paid by NAIC to Aithent for the applicable state);

5. "AND DUE AND OWING HEREUNDER BY THE NAIC" (i.e., additional royalties Aithent demonstrates it was owed in the applicable state);

6. "FOR THE SIX (6) MONTHS PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM" (i.e., during the six months preceding the alleged breach);

7. "APPLICABLE TO THE STATE FOR WHICH SUCH CLAIM ARISES." (i.e., once per state).

Simply put, Aithent's alleged damages should be calculated once per applicable state. Aithent's damages should be limited to the total royalties paid and owed under the Agreement, in that particular state, for the six months preceding the event giving rise to the alleged breach. Ex. 3 § 10(b). This measurement of damages is applicable on a state-by-state basis—one time per affected state—as it is the "AGGREGATE AMOUNT OF EACH PARTY'S LIABILITY TO THE OTHER PARTY." Id.

---

[8] Ex. 3 § 10(b) (emphasis added).

## III.  AITHENT'S DAMAGES ARE LIMITED

### A.  "The Aggregate Amount of Each Party's Liability"

The limitation of liability provision starts in relevant part by setting a total aggregate limit of liability on both parties.  It says: "THE AGGREGATE AMOUNT OF EACH PARTY'S LIABILITY TO THE OTHER PARTY . . . ARISING OUT OF, RESULTING FROM, OR IN ANY WAY CONNECTED WITH THE PERFORMANCE OR BREACH OF THIS AGREEMENT SHALL IN NO CASE EXCEED . . ."  Ex 3 § 10(b).  The use of the term "AGGREGATE" is crucial to the Court's analysis, as the parties' use of that term is a clear indication that this limitation of liability caps *all* of Aithent's potential damages.

It is **not** a limitation of liability per-*claim* or per-*breach*.  Such a reading would allow Aithent to simply plead its way around this contractual limitation.  Instead, it is an "AGGREGATE" limitation, something New York courts have often enforced.  Hartford Accident and Indemnity Co. v. Fireman's Ins. Co. of Newark, N.J., 536 N.Y.S.2d 260, 262 (N.Y. App. Div. 1989) (holding aggregate limitation of liability clause to be unambiguous and enforceable);  Nat'l State Bank v. Am. Home Assurance Co., 492 F. Supp. 393, 396 (S.D.N.Y. 1980) (stating that the term "aggregate" is not ambiguous and must be given its "plain and ordinary meaning.");  MyPlayCity, Inc. v. Conduit Ltd., 2011 WL 3273487, *6 (S.D.N.Y. July 21, 2011) (refusing to read contract in such a way as to ignore use of the term "aggregate" in limitation provision).[9]

It is clear that the six-month limitation of liability provision intends to apply to the *complete whole* of Aithent's damages (per applicable state).  If Aithent was permitted to

---

[9] Black's Law Dictionary defines "Aggregate" as follows:  "Entire number, sum, mass, or quantity of something; total amount; complete whole."  BLACK'S LAW DICTIONARY 65 (6th Ed. 1990).

recover up to six months' worth of revenue for each alleged breach, this provision would have no meaning. Such a reading would ignore the term "aggregate" and would be contrary to New York law. Ruttenburg, 626 N.Y.S.2d at 177 (stating that a court "should not adopt an interpretation which will operate to leave a provision of a contract without force and effect"); MyPlayCity, 2011 WL 3273487 at *6 (refusing to read contract in such a way as to ignore use of the term "aggregate" in limitation provision).

The parties' use of the term "AGGREGATE" makes it clear on the face of the Agreement that this six-month limitation is the cap on all damages (per state) arising from "the performance or breach of th[e] agreement." Ex. 3 § 10(b). This is the case regardless of how many claims Aithent has put forward.

### B. "The Event Giving Rise to Such Claim"

In Counts I-III and V, Aithent claims it was deprived of royalties—in whole or in part—for transactions it believes were or should have been subject to the License Agreement. Ex. 1 ¶¶ 39, 44, 49-50, 60.[10] Each of these particular breaches stems from a particular alleged action (or lack thereof) on the part of the NAIC. That action—or lack thereof—may constitute an "EVENT GIVING RISE TO SUCH CLAIM."

Count I stems from NAIC's failure to pay Aithent for all transactions submitted through NIPR's Gateway regardless of whether they were actually processed by SBS, the software based on the code NAIC licensed from Aithent.[11] Count II alleges that NAIC

---

[10] Count III seeks an upward adjustment for a portion of royalties already paid under the Agreement. There is no allegation that the royalties on these transactions were improperly paid, but rather that NIPR lowered the transaction fees, resulting in lower royalties for Aithent.

[11] In Count I, Aithent also seeks a royalty on transactions never mentioned in the License Agreement. NAIC strenuously denies these allegations as there is absolutely no requirement in the License Agreement that NAIC pay royalties on transactions processed by software other than the licensed software (LEO/SBS). However, as this motion focuses solely on the limitation of liability provision, NAIC assumes for purposes of this motion only that Aithent can demonstrate liability.

15

breached the covenant of good faith and fair dealing by essentially developing NIPR's Gateway at the expense of SBS (a factually-unsupported claim). Ex. 1, ¶ 44. Aithent further alleges that NAIC did not add additional transactions to SBS.[12] As such, Count II stems from an alleged decision or action to neither develop nor market SBS, thereby resulting in fewer royalties.

Count III stems from an alleged decision by NIPR (NAIC's affiliate) to lower transaction fees for transactions submitted through Gateway, resulting in reduced royalties. Count v. arises from NAIC's alleged suppression of a competitor and NAIC's alleged use of LEO to develop Gateway—a completely unfounded allegation. The event giving rise to Count V would presumably be some decision by NAIC to suppress Aithent or misappropriate Aithent's confidential information.[13]

Each of these actions and/or decisions—if proven—may potentially constitute an "EVENT GIVING RISE TO" Aithent's claim. Consequently, these actions may constitute points in time from which the trier of fact may look back six months to determine: (1) what royalties Aithent received from transactions processed in the state(s) in question and (2) what additional amount Aithent was owed from transactions in the state(s) during that time. This can be done *one time* per state in which Aithent can

---

[12] This claim is made despite the fact that there is no contractual obligation to add transactions to the Agreement absent agreement of the parties. It is also contrary to Aithent's unfounded claim that "any web-based system" owned by NAIC or NIPR are actually part of SBS and subject to the Agreement. On one hand, Aithent is saying that transactions *should have been added* to SBS, while on the other saying all transactions *are already part* of SBS.

[13] While Count v. (Unfair Business Practices) purports to be a tort claim, Aithent would have no claim absent the Agreement. *See generally*, Ex. 1, ¶¶ 58-63 (making repeated references to the Agreement and NAIC's license granted by the Agreement). This would bring Count v. under the purview of Section 10(b) as it is a claim "ARISING OUT OF, RESULTING FROM, OR IN ANY WAY CONNECTED WITH THE PERFORMANCE OR BREACH OF THIS AGREEMENT." Ex. 3, § 10(b). Nevertheless, in New York, parties are permitted to limit their exposure to tort claims, which the parties did in the second paragraph of § 10(b). The only exception to this right to disclaim tort liability is gross negligence. *Gold Connection Discount Jewelers, Inc. v. Am. District Telegraph Co., Inc.*, 622 N.Y.S.2d 7 (App. Div. 1995). In this case, there is no allegation of gross negligence in **any** of Aithent's claims.

demonstrate it was owed additional royalties, regardless of the theory. Ex. 3, § 10(b). This again is a product of the fact that the six-month limitation is an "AGGREGATE" limitation on the parties' liability to each other. Allowing Aithent to recover multiple time periods for a single state would improperly render the term "AGGREGATE" meaningless.

In determining which particular event will serve as the trigger for the six-month window, this will depend on what Aithent proves at trial, assuming it can prove any breach at all.

### C. "Applicable to the State for Which Such Claim Arises"

The Agreement dictates that the only way to view the damages for these claims is on a state-by-state basis. For each state (potentially), there may be four separate types of acts which may constitute the four separate types of alleged harm, and some of these types of alleged harm may have occurred multiple times (i.e. monthly royalty payments that were incorrect). But for each state, Aithent must elect one six month time period preceding a breach pertaining to that state as it can only have one aggregate amount of damages—six months of the "SUMS RECEIVED BY AITHENT AND DUE AND OWING HEREUNDER BY THE NAIC." Ex. 3 § 10(b).

Under no circumstances should Aithent's damages exceed this single six-month window of revenue per state, regardless of the number of breaches it has alleged. Section 10(b) sets out that each party's aggregate liability is limited to a six month window on a per-state basis. Section 10(b) makes clear at the end of the provision that the six month retrospective window is "APPLICABLE TO THE STATE FOR WHICH SUCH CLAIM ARISES." Again, as royalties for this Agreement were provided on a state-by-state basis

when new states licensed SBS from NAIC, this limitation on a per-state basis is both logical and consistent with the entire Agreement.

Interpreting this provision as a whole, Aithent's damages for its claims (however styled and however proven by Aithent) are limited to a single, six-month royalty period for each applicable state, looking back in time from the event giving rise to the claim in that state. This is a reasonable limitation of liability, and it is what the parties agreed to. Consequently, Aithent's damages for Counts I-III and v. should be limited to a six-month retrospective window per affected state. Not only does the Agreement compel this result, but so do the principles of justice and equity.

## IV.    THIS IS THE EQUITABLE RESULT

While the application of Section 10(b) to Counts I-III and v. may at first glance appear odd, that is only because Aithent's claims are so odd. Aithent is claiming that from the first day of the Agreement—over ten years ago—NAIC breached the Agreement because it did not pay Aithent royalties on transactions that were *never processed by the software Aithent licensed to NAIC*. This claim was newly-minted for this lawsuit.

Never in the first seven and one-half years of the Agreement did Aithent once request a royalty payment on the non-SBS transactions. Such an arrangement was never contemplated by the parties, let alone included in the Agreement. While Aithent may not be so bold as to explicitly claim it in its pleadings, Aithent's claim is for half of everything NAIC received in fees on **any** web-based system—of which NAIC has many—regardless of whether the system **actually used the LEO code licensed from**

**Aithent**.[14]  SOF ¶¶ 36-39.  And Aithent finally filed this lawsuit *nine years* after the Agreement was signed and one year before it expired.

Section 10(b) was put in place **<u>to avoid exactly this type of spurious claim</u>**, where Aithent sat on its proverbial hands for nine years and chose not bring this lawsuit until 2011.  Despite its near-decade of inaction, Aithent may argue that the application of this bilateral limitation of liability provision—which it negotiated and agreed to under the advice of counsel—is now somehow inequitable.  This is not true, because Aithent had other remedies available to it.

If NAIC was *actually* in material breach of the Agreement from Day One, for example, Aithent could have ceased performance and terminated the Agreement. <u>Awards.com v. Kinko's, Inc.</u>, 834 N.Y.S.2d 147, 156 (App. Div. 2007) (stating that a party to a contract may cease performance if the other party materially breaches the contract).  Aithent could have sued NAIC for breach and recovered its damages for the entire time period in question (assuming it could prevail on its unreasonable claims).  But it is only because Aithent chose to sit silently and wait nine years to bring its claim, that Section 10(b) restricts the amount of damages Aithent may now recover.

From the first moment Aithent was not paid on these additional non-SBS transactions (i.e., transactions that did not go through an SBS state and transactions that were not listed on Exhibit A to the Agreement), Aithent had actual notice and could have responded accordingly if it *truly believed* NAIC had breached the Agreement.  Aithent

---

[14] Taking this argument to its logical extreme, if NAIC had never successfully licensed SBS to a single state, Aithent still argues it is entitled to half of <u>all money</u> made by NAIC through any web-based transactions on any software.  This would include software that Aithent <u>did not create</u> and in most cases <u>predated</u> the Agreement.  What reasonable party would enter into such an agreement?  What reasonable party would fail to memorialize this in their contract if that was the agreement?

chose not to. And because Aithent chose not to, the limitation applies the way that it does. <u>NAIC cannot be deprived of its contractual rights because of Aithent's delays</u>.

Furthermore, this Court should not be persuaded by Aithent to ignore this limitation of liability provision—in contravention of New York law—simply because Aithent has put itself in this position. <u>Ruttenburg</u>, 626 N.Y.S.2d at 177. Nor should it be persuaded to apply the limitation in such a way that it has no rational meaning, as this would also be in contravention of New York law. <u>Id.</u>

Aithent chose to avail itself of the benefits of the Agreement for ten years, the entire lifetime of the Agreement. Over those ten years, NAIC paid Aithent millions of dollars in royalties and service fees. Just as Aithent availed itself of the Agreement's benefits and protections, it must also be subject to the Agreement's *limitations.* Aithent cannot pick and choose which provisions it wishes to abide by—and sue to enforce— while ignoring other provisions such as Section 10(b). *See generally*, <u>Westinghouse Elec. Corp. v. N.Y. Transit Auth.</u>, 623 N.E.2d 531, 535 (N.Y. 1993) (stating "[t]he law of contracts does not allow [a party] to pick and choose among the provisions of its contract . . .").

As Aithent has availed itself of the benefits of this Agreement for ten years (i.e. millions of dollars in royalties and fees paid to Aithent), so too should NAIC be able to avail itself of the *protections* of the Agreement. NAIC proceeded for years under the understanding that it was acting in accordance with the terms of the Agreement—namely because it *was* acting in accordance with the Agreement. NAIC also proceeded for years with the understanding that if either party breached the Agreement, there were limitations in place—limitations that applied to both parties. To allow Aithent to now recover

multiple times the amount of damages permitted by the Agreement would be an incredibly unjust result for NAIC.

In this lawsuit, Aithent has taken numerous liberties with the terms of the Agreement. While each particular liberty will be addressed as this case proceeds, it is critical at this stage that Aithent not be allowed to take liberties with Section 10(b). New York's highest court has clearly stated that "the courts should honor" liability limitations in contracts. Metro. Life Ins. Co. v. Noble Lowndes, Int'l, Inc., 643 N.E.2d 504, 507 (N.Y. 1994) (emphasis added). To quote Professor Corbin, this Court should let the parties "lie on the bed they made." 5 Corbin, CORBIN ON CONTRACTS, § 1068 at 386 (quoted by the New York Court of Appeals in Metro. Life Ins.).

At this stage, there is no need to get into the finer details regarding the amount of potential damages in each state or determine, in dollars, the effect of the limitation. That is a fact-intensive inquiry. At this stage, what is appropriate and necessary is a determination by this Court that Aithent's potential damages in Counts I-III, and v. cannot exceed: (1) the amount of revenue received by or owed to Aithent in a particular state during the six months preceding a claimed breach therein; (2) one time per applicable state.

## CONCLUSION AND RELIEF SOUGHT

Aithent and NAIC are both sophisticated parties. Through their counsel—and over the course of a year—the parties negotiated an Agreement that would govern their relationship. That Agreement governed their relationship for ten years. And for ten years, NAIC paid Aithent the royalties it was due under the Agreement.

Aithent now alleges that NAIC has apparently never fulfilled its obligations under the Agreement and Aithent only now—ten years later—seeks to enforce the Agreement.

While Aithent's claims are unfounded and out of time, if Aithent nevertheless wishes to enforce the Agreement, it must do so in a manner that is consistent with **all** of the terms therein. Aithent's claims, unsupportable as they are, are limited by Section 10(b).

NAIC respectfully requests that this Court enter partial summary judgment on the applicability of Section 10(b) to Plaintiff's Counts I-III and V, limiting Aithent's potential damages to revenue received and owed for the six months prior to the event giving rise to the breach, once per applicable state.

Respectfully submitted,

HUSCH BLACKWELL LLP

s/ Jeffrey J. Simon
Jeffrey J. Simon     MO# 35558
Michael S. Hargens   MO# 51077
Aaron J. Mann       MO# 53220
Judd M. Treeman     MO# 64392
4801 Main Street, Ste 1000
Kansas City, MO 64112
Telephone (816) 983-8000
Facsimile (816) 983-8080
jeff.simon@huschblackwell.com
michael.hargens@huschblackwell.com
aaron.mann@huschblackwell.com
judd.treeman@huschblackwell.com

Attorneys for Defendant National
Association of Insurance Commissioners'

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 14, 2013, the undersigned electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

Gregory P. Goheen
McAnany VanCleave & Phillips, P.A.
10 E. Cambridge Circle Drive, Suite 300
P.O. Box 171300
Kansas City, KS 66117
ggoheen@mvplaw.com

Peter Gallagher
Steven Johnson
Johnson Gallagher Magliery, LLC
99 Wall Street, 15th Floor
New York, NY 10005
pgallagher@jgmlaw.com
sjohnson@jgmlaw.com

s/ Jeffery J. Simon

23