IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| AITHENT, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| THE NATIONAL ASSOCIATION OF ) | |
| INSURANCE COMMISSIONERS, ) | JURY TRIAL DEMANDED |
| Serve: ) | |
| Gail M. Sciacchetano ) | |
| 2301 McGee Street, Suite 800 ) | |
| Kansas City, MO 64108 ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

By and for its complaint in this action, Plaintiff Aithent, Inc. ("**Aithent**"), through its undersigned counsel, alleges against the defendant, the National Association of Insurance Commissioners (the "**NAIC**"), as follows:

### NATURE OF THE ACTION

1. This lawsuit arises from NAIC's ongoing breach of its exclusive license agreement (the "**Agreement**") with Aithent, a technology company that develops and implements complex software systems. The Agreement concerns a valuable software system, developed and marketed by Aithent at great expense over the course of many years, which enabled regulatory insurance functions to be processed electronically over the internet. A copy of the Agreement is attached hereto as Exhibit A.

2. Previously, the insurance industry relied on the manual filing and the data entry of paper applications to process the countless regulatory insurance transactions that take place on a daily basis between the insurance regulators (the State Insurance Departments) and those they regulate (insurers, brokers and agents). Processing those transactions electronically is significantly faster and more accurate than paper processing and provides key benefits to the regulators by reducing cost and accelerating turnaround time.

3. By the time the Agreement was formed, Aithent's first generation system, known as LION, had already proven itself within the insurance industry and Aithent had developed a second generation system, called LEO, that was significantly more evolved than LION. Aithent was about to license LEO to certain large State Insurance Departments when it was approached by NAIC about entering into an exclusive licensing agreement with it.

4. NAIC is an association of insurance commissioners of the state insurance departments of the 50 United States, the District of Columbia, and the U.S. territories. NAIC knew that great amounts of money could be earned from the electronic processing of insurance regulatory transactions, and it knew there was no electronic processing system on the market comparable to LEO.

5. NAIC suggested that Aithent, rather than trying to license LEO to the various state insurance departments on a non-exclusive basis as it had been doing, should grant NAIC the exclusive right to use LEO in the insurance industry to develop an expanded processing system that would eventually be capable of processing all or virtually all transactions in the regulatory areas of licensing, insolvency and market conduct. And, it told Aithent that, given NAIC's unique ability to market to its own members (the insurance commissioners of each of the 50 states), this LEO–based system would corner large segments of the market and generate

substantial revenue for Aithent, NAIC and its close affiliate, the National Insurance Producers Registry ("**NIPR**").

6. Based on these and similar representations, Aithent entered into the Agreement and granted NAIC the exclusive right to use LEO in the U.S. insurance industry. NAIC agreed that it would use LEO as the basis for developing the contemplated system, would provide Aithent with the right of first refusal to perform the technical work necessary to develop the contemplated system, and would take reasonable steps to market the contemplated system.

7. Aithent did not receive any upfront payment for granting NAIC exclusive rights to LEO. Rather, NAIC agreed to pay royalties to Aithent whenever (with one exception, discussed *infra*) it, or NIPR, earns revenue from the electronic processing of the transactions that fall within the Agreement. The parties enumerated a set of initial transactions that Aithent would be entitled to receive royalties on (which were those LEO was capable of processing when the Agreement was formed) and agreed to add additional transactions to the Agreement as the system was expanded to process new transactions. (Each transaction that is subject to the Agreement is referred to as a "**Transaction**", and are collectively referred to as "**Transactions**").

8. Of course, by granting NAIC the exclusive right to use LEO, Aithent was placing the commercial fate of its valuable product in NAIC's hands. Unfortunately, NAIC betrayed Aithent's trust, and breached the Agreement, by developing its own web based systems to process Transactions and by refusing to pay Aithent royalties on Transactions processed through its non-LEO based systems. Critically, NAIC's obligation to pay Aithent royalties on Transactions does not turn on whether the system used to process the Transaction utilizes LEO.

Rather, NAIC's royalty obligation to Aithent is triggered whenever it or NIPR earns revenue by processing a Transaction through a web-based system.

9. In addition, NAIC breached its contractual duty to market and develop the contemplated system by implementing its own competing web based systems. And, by using its exclusive license to LEO as a tool to eliminate or suppress a competing product, NAIC breached its contractual duties of good faith and fair dealing, and is unfairly competing with Aithent.

10. Nor has NAIC honored its other contractual duties. For example, even though the Agreement forbids NAIC or NIPR from lowering the prices charged for any Transaction by more than 15% without Aithent's consent, NAIC and NIPR have done just that. NAIC also breached its contractual duties by hiring at least one employee away from Aithent. Because the employee in question was a key member of the LEO development team, it is natural to wonder whether NAIC illicitly poached that employee in order to exploit his knowledge of LEO for the development of NAIC/NIPR's competing products. These actions constitute separate breaches of the Agreement, and violate unfair competition laws as well.

11. Aithent seeks monetary damages for NAIC's many past breaches of the Agreement, and a declaratory judgment to prevent future breaches. Aithent cannot quantify its damages at this time because the relevant records are under the exclusive control of NAIC, which has refused to produce them, even in the context of a contractually required mediation. Based on the limited information that is available, however, it is evident that Aithent has suffered many millions of dollars in losses because of NAIC's repeated breaches of the Agreement.

## PARTIES

12. Aithent is incorporated in New York State and has its principal place of business at 75 Maiden Lane, New York, New York 10038.

4

Case 4:11-cv-00173-GAF   Document 1   Filed 02/14/11   Page 4 of 15
Case 4:11-cv-00173-GAF   Document 89-1   Filed 01/14/13   Page 4 of 15

13. Upon information and belief, NAIC is at all relevant times a Delaware corporation, currently active and registered to do business in the State of Missouri with a principal place of business at 2301 McGee Street, Kansas City, Missouri.

## JURISDICTION AND VENUE

14. The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

15. This Court has personal jurisdiction over NAIC because it has its principal place of business in Missouri. Venue in this judicial district is proper, pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to Aithent's claims occurred, and NAIC is currently subject to personal jurisdiction in, the Western District of Missouri. Further, NAIC agreed that any lawsuit initiated by Aithent concerning the Agreement, "will take place in Kansas City, Missouri." (Agreement, Para 13).

## BACKGROUND

16. Aithent's business focus is to develop and apply technology to help government, insurance, banking and health care organizations manage their information needs. In or around 1998, Aithent introduced a software system that was capable of processing insurance regulatory transactions electronically. This system, which was known as LION, delivered cost and efficiency benefits for the State Insurance Departments, and benefited the industry as a whole by enabling same day turnaround of certain transactions (such as a broker's application for a license to sell insurance in a state other than the broker's state of residence) that had previously taken days to complete.

5

Case 4:11-cv-00173-GAF Document 1 Filed 02/14/11 Page 5 of 15
Case 4:11-cv-00173-GAF Document 89-1 Filed 01/14/13 Page 5 of 15

17. LION was attractive to the various State Insurance Departments because it improved the processing of regulatory transactions by enabling the electronic submission of data, thereby reducing the labor needed for data entry. Aithent had already licensed LION to two State Insurance Departments – New York and Arkansas – when it began working on LEO, its second generation system.

18. Aithent completed LEO in late 2001, and was in the process of negotiating license agreements with several large State Insurance Departments, when it was approached by NAIC and NIPR through Mr. Gary Gummig, who was then the Chief Information Officer of NAIC and the NIPR. Upon information and belief, there is little to no material distinction between NAIC and NIPR, with the latter functioning as the alter ego of the former. NAIC and NIPR work out of the same office and NIPR's Board of Directors is controlled by NAIC.

19. NAIC/NIPR had been interested in the commercial potential of electronically processing regulatory transactions for some time. In fact, they had already jointly developed their own system, known as Gateway, for electronically processing regulatory transactions. Gateway, however, was a limited system that only processed two types of regulatory transactions (appointments and terminations). By acquiring the rights to LEO, NAIC/NIPR would be acquiring a far superior system that could be used as the basis for a system that could be used by any state and allow NAIC and NIPR to process many additional types of transactions at vastly greater volumes.

20. Having created NIPR with the goal of collecting data relating to insurance brokers, agents, adjusters and others (known as "producers" in the industry), NAIC saw that, through NIPR, it could engage the insurance industry – whose business is particularly dependent upon the prompt completion of regulatory transactions – to use the system and generate fees. The

6

Case 4:11-cv-00173-GAF   Document 1   Filed 02/14/11   Page 6 of 15
Case 4:11-cv-00173-GAF   Document 89-1   Filed 01/14/13   Page 6 of 15

representatives of NAIC and NIPR who were negotiating with Aithent stressed that, given NAIC's marketing advantages, the system they intended to create using LEO would be a great commercial success. When NAIC was trying to persuade Aithent to enter into the Agreement, it projected that Aithent would earn at least $16 million in the first five years alone if it gave NAIC the exclusive license it was seeking.

21. Aithent and NAIC entered into the Agreement in July 2002. (The NIPR did not sign the Agreement separately, but Catherine Weatherford, who signed on behalf of NAIC was, upon information and belief, also an officer of NIPR). In the Agreement, Aithent provided NAIC with the exclusive right to use LEO in the insurance industry. The Agreement provides that it is to be governed by New York law.

22. NAIC agreed to use its exclusive rights to LEO for the purpose of developing the contemplated system, which the Agreement refers to as State Based Solutions, or SBS. The Agreement reflects the parties' understanding that this system would eventually be capable of processing all or nearly all transactions in three major areas of insurance regulation – licensing, solvency, and market conduct. NAIC also gave Aithent the right of first refusal to develop SBS according to the terms of a separate services agreement (the "**Services Agreement**") executed the same day as the Agreement.

23. Aithent did not receive any upfront fee payment for granting NAIC exclusive rights to LEO even though it was giving up its valuable right to license a product with great financial potential which it spent millions of dollars developing. NAIC was undoubtedly aware of LEO's market prospects and actually blocked Aithent from consummating license agreements with a handful of large states, by informing the states that NAIC was about to obtain an exclusive

license to use LEO, and asking the states to refrain from entering into a license agreement with Aithent until NAIC closed its deal.

24. Rather than an upfront payment, Aithent's compensation under the Agreement was limited to a monthly "Royalty" payment that was tied to the net revenues generated from the contemplated Transactions. The Transactions consist of eight types of transactions enumerated in the Agreement, and any others the parties might later choose to add to the Agreement. With one limited exception discussed in more detail below, NAIC is required to pay Aithent a royalty equal to "50% of the Net Revenue"—*i.e.*, revenue derived from license fees and transaction fees— that "the NAIC or NIPR" receive in connection with the electronic processing of any Transaction. Agreement § 6(a)(i).

25. The one exception relates to the two Transactions – appointments and terminations – that NIPR had been conducting on Gateway before the Agreement was formed. NAIC is not required to share the revenue it or NIPR earns from appointment or termination transactions conducted with the States that were using Gateway to process appointment and termination transactions before the Agreement was executed. However, NAIC is required to pay Aithent a 50% royalty on revenue generated from appointment and termination transactions with States that had not previously been using Gateway. The States that had been using Gateway prior to formation of the Agreement are identified in Exhibit D to the Agreement.

26. Because Aithent's royalty is tied to the revenue that NAIC or NIPR earns from processing the Transactions, the Agreement also contains a clause preventing NAIC, or NIPR, from reducing the prices charged for any Transaction by more than 15% in any calendar year without first obtaining Aithent's consent. Agreement § 6(a)(v). The Agreement also requires NAIC to take reasonable steps to market SBS to the states.

8

Case 4:11-cv-00173-GAF   Document 1   Filed 02/14/11   Page 8 of 15
Case 4:11-cv-00173-GAF   Document 89-1   Filed 01/14/13   Page 8 of 15

27. The Services Agreement also forbids NAIC from hiring Aithent's employees. Service Agreement § 13.1.

## NAIC Breaches the Agreement By Failing to Pay Royalties Owed

28. After the Agreement was executed, NAIC developed (using Aithent to provide technical services pursuant to the Services Agreement) a LEO-based system for processing Transactions electronically, and branded that system "SBS." While SBS was a technical success, its commercial results were extremely disappointing. It was licensed to only a small number of the State Insurance Departments that NAIC predicted would license it, and it generated only a small portion of the royalties that NAIC had projected. Moreover, the system was never expanded to include the many additional transactions the parties contemplated would be added to the system. In fact, only one additional transaction was ever added to the Agreement – continuing education.

29. NAIC made various excuses for the LEO-based system's subpar commercial performance, none of which hinted at the truth. What NAIC did not tell Aithent is that NAIC, working alone or in conjunction with NIPR, had enhanced or developed its own web based systems, including Gateway, to process the very Transactions that are subject to the Agreement, as well as the additional transactions the parties intended would be added to the Agreement. Perhaps not coincidentally, NAIC/NIPR enhanced Gateway and its other web based systems in this manner only *after* it acquired the LEO code, and hired an Aithent employee, Mr. Sanjay Saini, who had been a key member of the LEO development team.

30. Having enabled Gateway and other NAIC/NIPR web based systems to process the Transactions that the LEO based system was intended to handle, NAIC and NIPR actively promoted Gateway and its other web based systems as an alternative to the LEO-based system

9

Case 4:11-cv-00173-GAF   Document 1   Filed 02/14/11   Page 9 of 15
Case 4:11-cv-00173-GAF   Document 89-1   Filed 01/14/13   Page 9 of 15

and refused to pay Aithent any portion of the revenue that NAIC and/or NIPR generated by processing Transactions using Gateway or other non-LEO systems. By failing to pay royalties for such revenue, NAIC breached the Agreement which requires NAIC to pay royalties whenever it or NIPR earns revenue from the electronic processing of a Transaction through a system that meets the contractual definition of "SBS."

31. The Agreement defines "SBS" extremely broadly, encompassing *any*:

> web-based system proprietary to the NAIC providing software, tools, databases, and information to facilitate state insurance departments in their market conduct, licensing and solvency functions.

*Agreement § 1*. As the broad language of the Agreement reflects, the parties never intended to limit the payment of royalties to instances in which the LEO code is used to process a Transaction. Of course, Aithent would have never granted NAIC the exclusive right to use and market LEO if NAIC was only required to pay Aithent royalties if NAIC/NIPR chose to use the LEO based system, as opposed to some other web based system it later developed. As the Agreement makes clear, Aithent is contractually entitled to royalties whenever a Transaction is processed using a system that matches the contractual definition of SBS. Transactions processed through Gateway and NAIC/NIPR's other web based systems plainly fall within this category and NAIC's failure to pay royalties for revenue earned on such Transactions constitutes a breach of Section 6 of the Agreement.

32. By developing, promoting and using web based systems that compete with the LEO-based system, while failing to pay Aithent any royalties on Transactions processed through non-LEO based web systems, NAIC has also breached its contractual duties of good faith and fair dealing. NAIC has further breached its duties of good faith and fair dealing by failing to expand the LEO based system to include the many additional transactions that the parties

10

Case 4:11-cv-00173-GAF   Document 1   Filed 02/14/11   Page 10 of 15
Case 4:11-cv-00173-GAF   Document 89-1   Filed 01/14/13   Page 10 of 15

contemplated the system would handle, choosing instead to use Gateway and other NAIC/NIPR web based systems to process these additional transactions to improperly avoid paying royalties to Aithent.

### NAIC's Other Breaches Of the Agreement

33. Upon information and belief, NAIC has also violated the provision of the Agreement relating to the pricing of transaction fees for the Transactions. Pursuant to paragraph 6(a)(v) of the Agreement, the transaction fee for any Transaction may not be reduced by more than 15% during any calendar year without first obtaining Aithent's consent. Upon information and belief, the prices charged by NAIC/NIPR for many of the Transactions have been reduced, by substantially more than 15%, without Aithent's consent, on many different occasions. Each such instance is a violation of paragraph 6(a)(v) of the Agreement.

34. NAIC and/or NIPR, upon information and belief, have breached the Agreement by hiring third parties to perform services without providing Aithent the right of first refusal to perform such services, and it breached the Services Agreement by hiring Mr. Saini, a former Aithent employee, in 2004.

### COUNT I
### (Breach of the Agreement)

35. Aithent repeats and realleges the allegations contained in paragraphs 1 through 34 as though fully set forth herein.

36. The Agreement is a valid and binding contract.

37. The Agreement requires NAIC to pay royalties to Aithent, equal to 50% of the net revenues received by NAIC or NIPR, in connection with the electronic processing of Transactions through "SBS," except for appointment and termination Transactions conducted in the states listed on Exhibit D to the Agreement.

11

Case 4:11-cv-00173-GAF   Document 1   Filed 02/14/11   Page 11 of 15
Case 4:11-cv-00173-GAF   Document 89-1   Filed 01/14/13   Page 11 of 15

38. Transactions processed through Gateway and other NAIC/NIPR web based systems qualify as Transactions processed through SBS.

39. NAIC and NIPR have earned substantial amounts of revenue in connection with Transactions processed through Gateway and other NAIC/NIPR web based systems without paying Aithent royalties as required under the Agreement.

40. Aithent has been damaged in an amount to be determined at trial.

## COUNT II
### (Breach of the Agreement and Breach of Implied Covenant of Good Faith and Fair Dealing)

41. Aithent repeats and realleges the allegations contained in paragraphs 1 through 40 as though fully set forth herein.

42. The Agreement is a valid and binding contract.

43. The Agreement grants NAIC an exclusive license to use LEO in the United States Insurance Sector and gave Aithent the right to royalty payments for all Transactions processed using SBS.

44. By choosing to develop Gateway and other NAIC/NIPR web based systems to process Transactions, NAIC impeded the development, production and marketing of the LEO-based SBS, and improperly prevented Aithent from receiving the benefits of the Agreement, including revenue from Transactions governed by the Agreement and other Transactions the parties intended to add to the Agreement, in breach of NAIC's duty of good faith and fair dealing.

45. NAIC/NIPR suppressed the development of the LEO-based system unreasonably and/or in bad faith, for the purpose of avoiding NAIC's contractual obligations and inhibiting the development of a competitor to the Gateway system.

46. Aithent has been injured in an amount to be determined at trial.

## COUNT III
### (Breach of the Agreement)

47. Aithent repeats and realleges the allegations contained in paragraphs 1 through 46 as though fully set forth herein.

48. The Agreement is a valid and binding contract.

49. The Agreement prohibits NAIC and NIPR from lowering Transaction fees for electronically processing the Transactions by more than 15% in any calendar year absent Aithent's consent.

50. NAIC has breached this provision by lowering, and/or causing or consenting to NIPR to lower, the prices charged for Transactions by more than 15% in a single calendar year without Aithent's consent.

51. Aithent has been injured in an amount to be determined at trial.

## COUNT IV
### (Breach of the Agreement and the Services Agreement)

52. Aithent repeats and realleges the allegations contained in paragraphs 1 through 51 as though fully set forth herein.

53. The Services Agreement is a valid and binding contract which is still in effect.

54. The Services Agreement prohibits NAIC from hiring any Aithent employee during its term or within one year of its termination.

55. NAIC has breached the Services Agreement by hiring Sanjay Saini, who was at the time employed by an Aithent and a key member of the LEO development team.

56. Aithent has been damaged in an amount to be determined at trial.

## COUNT V
## (Unfair Business Practices)

57. Aithent repeats and realleges the allegations contained in paragraphs 1 through 56 as though fully set forth herein.

58. Under the Agreement, Aithent gave NAIC (i) the exclusive right to exploit and market LEO in the United States Insurance Sector, and (ii) access to Aithent's confidential and proprietary information, including the LEO source code.

59. Prior to executing the Agreement, Aithent had already demonstrated that it could successfully market and license LEO and products like it in the United States Insurance Sector.

60. NAIC used its exclusive license to prevent Aithent from marketing LEO so that Gateway and other NAIC/NIPR based systems, once fully developed, could draw revenue away from the LEO-based SBS.

61. On information and belief, NAIC also used Aithent's confidential information in developing Gateway as a product that competes with the LEO-based SBS.

62. NAIC took the above described actions in bad faith, with the intent of unfairly suppressing or eliminating Aithent as a competitor.

63. By using its exclusive license to suppress a competitor, and by using Aithent's confidential information to develop a product which competes with LEO, NAIC engaged in unfair competition.

64. Aithent has been damaged in an amount to be determined at trial.

WHEREFORE, Aithent respectfully requests that this Court enter judgment in its favor and against NAIC and grant the following relief:

    (a)    A declaration that NAIC is required to pay royalties, pursuant to the terms of the Agreement, whenever it or NIPR earn revenue in connection with

the electronic processing of any Transaction on Gateway, or any other system that falls within the contractual definition of "SBS;"

(b)     An order awarding damages in an amount to be determined at trial; and

(c)     Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

McANANY, VAN CLEAVE & PHILLIPS, P.A.
10 E. Cambridge Circle Drive, Suite 300
Post Office Box 171300
Kansas City, Kansas 66117-1300
Telephone:    (913) 371-3838
Facsimile:     (913) 371-4722
E-mail: ggoheen@mvplaw.com

By: /s/ Gregory P. Goheen
       GREGORY P. GOHEEN     #58119

And

Peter Gallagher
Steven Johnson
KENNEDY JOHNSON GALLAGHER LLC
99 Wall Street, 15th Floor
New York, New York 10005
Telephone: (212) 248-2220
Facsimile: (212) 248-0170
E-mail: pgallagher@kjglaw.com
            sjohnson@kjglaw.com

Attorneys for Plaintiff Aithent, Inc.