# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| AITHENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 4:11-CV-00173-GAF |
| | ) | |
| NATIONAL ASSOCIATION OF INSURANCE | ) | JURY TRIAL DEMANDED |
| COMMISSIONERS, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S ANSWER AND COUNTERCLAIM

Defendant, National Association of Insurance Commissioners ("NAIC"), for its Answer and Counterclaim against plaintiff Aithent, Inc. ("Aithent"), states and alleges as follows:

1. Denies the allegations in paragraph 1 of the Complaint.

2. Denies the allegations in paragraph 2.

3. Denies the allegations in paragraph 3.

4. Admits that NAIC is a non-profit corporation whose membership consists of the chief insurance regulatory officials of the fifty states, the District of Columbia, and the U. S. Territories. Denies the remaining allegations in paragraph 4.

5. Admits that NAIC entered into negotiations with Aithent for NAIC to obtain an exclusive license to Aithent's product, LEO, for the purpose of using LEO as starter code for NAIC's development of its proprietary product, State-Based Systems ("SBS"). Denies the remaining allegations in paragraph 5.

6. Denies the allegations in the first sentence in paragraph 6. Admits that the License Agreement ("Agreement") called for LEO to be used as the foundation for development

Case 4:11-cv-00173-GAF Document 89-5 Filed 03/09/13 Page 1 of 24      EXHIBIT 5

of SBS and that NAIC expressly agreed to use reasonable efforts to market SBS. Denies the remaining allegations in paragraph 6.

7.   Paragraph 7 is Aithent's characterization of the terms of the Agreement. Such terms speak for themselves, so NAIC denies the allegations in paragraph 7.

8.   Denies the allegations in paragraph 8.

9.   Denies the allegations in paragraph 9.

10.  Denies the allegations in paragraph 10.

11.  Denies the allegations in paragraph 11.

12.  Lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 12, and therefore denies same.

13.  Admits the allegations in paragraph 13.

14.  Admits the allegations in paragraph 14.

15.  Admits the allegations in paragraph 15.

16.  Lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 16 and therefore denies same.

17.  Lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 17 and therefore denies same.

18.  Admits that Mr. Gary Gummig was the Chief Information Officer of NAIC in 2001 and that Mr. Gummig had discussions with Aithent regarding an exclusive license to LEO. Denies the remaining allegations in paragraph 18.

19.  Denies the allegations in paragraph 19.

20.  Denies the allegations in paragraph 20.

21.     Admits that Aithent and NAIC entered into the Agreement in July 2002. Admits that NIPR did not sign the Agreement. Admits that Aithent provided NAIC with the exclusive right to use LEO in the insurance sector, as defined in the Agreement. Admits that the Agreement provides that it is to be governed by New York law. Denies the remaining allegations in paragraph 21.

22.     Admits that LEO was used as starter code for the purpose of developing SBS. NAIC admits that, by a separate agreement (the "Services Agreement"), Aithent obtained a right of first refusal on certain work relating to SBS. Denies Aithent's characterizations of the terms of the Agreements at issue in this lawsuit and denies the remaining allegations in paragraph 22.

23.     Denies the allegations in paragraph 23.

24.     Admits that Aithent is entitled to a royalty under the terms of the Agreement, as provided by the Agreement's express terms. Denies Aithent's characterizations of the terms of the Agreement and denies the remaining allegations in paragraph 24.

25.     Denies Aithent's characterization of the terms of the Agreement and denies the remaining allegations in paragraph 25.

26.     Admits that the Agreement requires NAIC to make reasonable efforts to market SBS. Denies Aithent's characterization of the terms of the Agreement and denies the remaining allegations in paragraph 26.

27.     Denies Aithent's characterizations of the terms of the Service Agreement and denies the allegations in paragraph 27.

28.     Admits that NAIC developed a LEO-based system for processing certain transactions electronically, and that that system is known as "SBS," as set forth by the express terms of the Agreement. Denies the remaining allegations in paragraph 28.

29.     Denies the allegations in paragraph 29.

30.     Denies the allegations in paragraph 30.

31.     Denies the allegations in paragraph 31.

32.     Denies the allegations in paragraph 32.

33.     Denies the allegations in paragraph 33.

34.     Denies the allegations in paragraph 34.

## COUNT I
### (Breach of the Agreement)

35.     Repeats and realleges the responses contained in paragraphs 1 through 34 above as though fully set forth herein.

36.     Admits that the Agreement is a valid and binding contract as alleged in paragraph 36.

37.     Admits that the Agreement requires NAIC to pay royalties to Aithent as set forth in the express terms of the Agreement.  Denies Aithent's characterization of those terms and denies the remaining allegations in paragraph 37.

38.     Denies the allegations in paragraph 38.

39.     Denies the allegations in paragraph 39.

40.     Denies the allegations in paragraph 40.

## COUNT II
### (Breach of the Agreement and Breach of Implied
### Covenant of Good Faith and Fair Dealing)

41.     Repeats and realleges the responses contained in paragraphs 1 through 40 above as though fully set forth herein.

42. This Count II is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 42 should a response become necessary.

43. This Count II is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 43 should a response become necessary.

44. This Count II is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 44 should a response become necessary.

45. This Count II is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 45 should a response become necessary.

46. This Count II is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 46 should a response become necessary.

## <u>COUNT III</u>
### (Breach of the Agreement)

47. Repeats and realleges the responses contained in paragraphs 1 through 46 above as though fully set forth herein.

48. Admits that the Agreement is a valid and binding contract as alleged in paragraph 48.

49. Denies the allegations in paragraph 49.

50. Denies the allegations in paragraph 50.

51. Denies the allegations in paragraph 51.

## COUNT IV
### (Breach of the Agreement and the Services Agreement)

52.     Repeats and realleges the responses contained in paragraphs 1 through 51 above as though fully set forth herein.

53.     This Count IV is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 53 should a response become necessary.

54.     This Count IV is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 54 should a response become necessary.

55.     This Count IV is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 55 should a response become necessary.

56.     This Count IV is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 56 should a response become necessary.

## COUNT V
### (Unfair Business Practices)

57.     NAIC repeats and realleges its responses contained in paragraphs 1 through 56 above as though fully set forth herein.

58.     This Count V is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 58 should a response become necessary.

59.     This Count V is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 59 should a response become necessary.

60.     This Count V is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 60 should a response become necessary.

61.     This Count V is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 61 should a response become necessary.

62.     This Count V is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 62 should a response become necessary.

63.     This Count V is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 63 should a response become necessary.

64.     This Count V is the subject of a Motion to Dismiss contemporaneously filed by NAIC. NAIC reserves the right to respond to the allegations in paragraph 64 should a response become necessary.

65.     NAIC denies all allegations of the Complaint which are not expressly admitted above, and denies that Plaintiff is entitled to any of the remedies set forth in the WHEREFORE clause following paragraph 64.

66.     Under the Agreement, the prevailing party is entitled to an award of its reasonable attorneys' fees and costs. Should NAIC prevail on some or all of Aithent's claims, it is entitled to such an award.

## AFFIRMATIVE DEFENSES

67.     Aithent's claims, and each of them, fail to state a claim upon which relief may be granted.

68.     Count I is barred, in whole or in part, by the applicable statute of limitations for contract actions under the laws of the State of New York.

69.     Count II is barred, in whole or in part, by the applicable statute of limitations for contract actions under the laws of the State of New York.

70.     Count III is barred, in whole or in part, by the applicable statute of limitations for contract actions under the laws of the State of New York.

71.     Count IV is barred, in whole or in part, by the applicable statute of limitations for contract actions under the laws of the State of New York.

72.     Count V is barred, in whole or in part, by the applicable statute of limitations for tort claims under the laws of the State of New York.

73.     Plaintiff is estopped from bringing the claims set forth in the Complaint by reason of its own actions and NAIC's reliance upon those actions.

74.     Plaintiff is barred by the doctrine of latches from pursing the claims in the Complaint and the resulting prejudice to NAIC.

75.     Plaintiff has waived the claims set forth in the Complaint by reason of its own prior actions and statements.

76.     Plaintiff's claims for unpaid royalties are barred by the doctrine of payment.

77. Plaintiff's claims, and all of them, are limited by the language in paragraph 10 of the Agreement.

78. Plaintiff's claims for breach of contract are barred by reason of Plaintiff's failure to perform all of its obligations under the Agreement.

79. NAIC is entitled to set-off against any amount adjudged to be owing to Aithent the amounts owing to NAIC under Count III of NAIC's Counterclaims, as set forth below.

80. Plaintiff's recovery is barred or reduced by its failure to mitigate its damages.

**WHEREFORE**, NAIC prays for this Court to enter judgment in NAIC's favor and against Plaintiff on all claims in the Complaint; for an award of NAIC's reasonable attorneys' fees and costs incurred in defense of this matter; and for such other and further relief as this Court deems just and reasonable.

## COUNTERCLAIM

For its counterclaim against Aithent, NAIC incorporates the admissions above, and states and alleges as follows:

## NATURE OF THE ACTION AND RELIEF SOUGHT

1. Since July 2002, Aithent and NAIC have been operating under the terms of the License Agreement, which calls for NAIC to make payment of monthly royalties to Aithent based upon revenue received from certain electronic transactions conducted through SBS. SBS is NAIC's proprietary web-based system which allows state insurance departments to process certain on-line transactions related to insurance agent and company licensing.

Over the past approximately 8 years, NAIC has paid monthly royalty payments to Aithent totaling more than $5 million, and Aithent has accepted those payments. Now, in this lawsuit, Aithent is claiming that it is entitled to royalty payments on transactions which occur completely

Case 4:11-cv-00073-GAF Document 89-5 Filed 03/09/11 Page 9 of 24

outside of SBS, even with regard to other proprietary products and systems which already existed years before the License Agreement was signed. Contrary to Aithent's claims, however, the express language of the License Agreement clearly defines the types of transactions on which Aithent is to be paid a royalty: only those which occur within SBS.

Through this counterclaim, NAIC seeks a declaration that it has honored its obligations under the contract, and that it has been paying the proper royalty to Aithent. In Count II, NAIC seeks to enjoin Aithent from marketing or selling its product called "ALiS" (Aithent Licensing System), which is a derivative work of LEO and therefore subject to NAIC's exclusive rights within the insurance sector. In Count III, NAIC seeks, as a set off against any award Aithent obtains, the damages suffered by NAIC as a result of the extremely poor quality of the LEO product and code which Aithent delivered to NAIC at the inception of their business relationship.

## PARTIES

2.      NAIC is a non-profit corporation whose membership consists of the chief insurance regulatory officials of the fifty states, the District of Columbia, and the U. S. Territories. NAIC's mission is to support the states in their regulation of the business of insurance. NAIC assists state insurance regulators, individually and collectively, in serving the public interest and promoting a stable and competitive insurance market place. NAIC is headquartered at 2301 McGee Street in Kansas City, Missouri.

3.      Aithent, Inc. ("Aithent") is a software company located in New York City, New York, which offers several software solutions. The two solutions pertinent to this dispute are LEO ("Licensing Environment Online") and ALiS ("Aithent Licensing System").

4.      Although not a party to the present dispute, nor to any agreement with Aithent, it is also important to be familiar with an entity called National Insurance Producer Registry

("NIPR"). NIPR is a Missouri non-profit corporation in good standing, originally incorporated by NAIC in 1996 under the name "Insurance Regulatory Information Network" (consistently referred to herein, for ease of reference, as "NIPR"). NIPR's purpose is to make the process for licensing and appointing insurance producers (i.e., agents) as cost-effective, streamlined and uniform as possible. NIPR owns proprietary, web-based software which serves as a front-end portal to allow insurance agents, companies or third-party administrators to transmit regulatory licensing, renewal and appointment/termination transactions electronically to the states (referred to herein as the "NIPR Front-End Portal"). NIPR is a somewhat unique public-private partnership in that its Board of Directors consists of 13 members, 6 members from NAIC, 6 industry trade association representatives, and the CEO of NAIC.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

6.      This Court has personal jurisdiction over Aithent because Aithent has transacted business in this state and has brought the primary complaint in this Court. Moreover, this counterclaim arises out of the same transaction or occurrence that is the subject matter of Aithent's claims. Venue in this judicial district is proper under Fed. R. Civ. P. 13 and 28 U.S.C. § 1391(a).

## BACKGROUND

7.      Under the law in each of the 50 states, insurance agents are required to have a license in each state in which they sell insurance. These licenses are issued by state insurance departments. Likewise, insurance companies are required to "appoint" or "terminate" their

agents through regulatory filings in the pertinent state insurance department. Historically, this process was done by paper and U.S. mail.

8.      In the 1990's, NAIC began to work with the insurance industry and state regulators to automate and streamline this process, and to make it available on-line.

9.      In 1996, NAIC formed NIPR as a separate entity for the purpose of advancing this mission. In fairly short order, NIPR created the NIPR Front-End Portal, which could be accessed on-line at www.nipr.com.

10.      NIPR Front-End Portal served then, and serves now, as an entry point for on-line licensing transactions. An agent, company, or third-party administrator seeking to make a regulatory licensing filing may login at www.nipr.com, and complete the information required by the on-line forms. The NIPR Front-End Portal transmits this information to the pertinent state insurance department. Agents and companies began using the NIPR Front-End Portal as early as 1997, and continue to use it today.

11.      Also in the late 1990's, a handful of state insurance departments began to implement changes in their own, separate, "back-end" processing systems in order to enable them to accept electronic licensing transactions. A user could login at www.nipr.com and access the NIPR Front-End Portal, input the requested information, and hit the "send" button. The information was then sent from www.nipr.com to the pertinent state's "back-end" system for processing. As of the late 1990's, some states had developed their own proprietary software to handle this "back-end" transaction, while other states handled the "back-end" processing by obtaining a license to use a commercially available software product called "Sircon for States," and/or its predecessors. The NIPR Front-End Portal communicated with Sircon for States and with the various state proprietary systems.

## NAIC AND AITHENT ENTER INTO THE LICENSE AGREEMENT

12.     By 2000, some states were requesting that NAIC consider developing a web-based, back-end processing software product to address the evolving marketplace and NAIC uniformity initiatives in the area of producer licensing.  Since NAIC was already providing many electronic tools to support state insurance regulators and wanted to support the furtherance of producer licensing efficiency objectives, NAIC agreed to explore this possibility.

13.     By 2001, Aithent began to develop its LEO product.  LEO was intended to be a web-based product licensed to state insurance departments to handle back-end processing of license transactions, as a direct competitor to "Sircon for States."

14.     In late 2001 and early 2002, NAIC evaluated two alternative approaches to developing the software requested by the state insurance departments:  (1) developing a software product from scratch, or (2) starting with a similar software product already under development by a third party.  As a result, NAIC began discussions with Aithent about obtaining an exclusive license to LEO for the purpose of using LEO as a "starter code" for NAIC's development of its own proprietary, web-based software, to be called State-Based Systems, or "SBS."

15.     In July 2002, Aithent and NAIC entered into the License Agreement which is at issue in this dispute.  The Agreement gave NAIC an exclusive license to LEO in the Insurance Sector, to "be used as the foundation in the development, implementation, operation, maintenance, and enhancement of SBS."  Agreement (Doc. 1, Ex. A, § 4(d)).  In return, Aithent was to receive a 50% royalty from the fee charged to a user, i.e., an agent or company, each time an "Electronic Transaction" (as defined in the Agreement) occurred "within SBS."  Id. at §6(a)(i).

16.     In July 2002, when the Agreement was signed, there were no state insurance departments using SBS.  As of today, there are twenty-one (21) states which have licensed SBS from NAIC.  Sixteen (16) of those licensed states have implemented the license and are currently using SBS, and the other five states are in various stages of implementation.  The remaining states either have a proprietary system which they developed themselves, or have licensed the "Sircon for States" software, which is the primary competitor to SBS.

17.     Under the express terms of the Agreement, Aithent's right to receive this royalty ends in July 2012.  After July 2012, NAIC has a perpetual, exclusive, royalty-free license to LEO, and Aithent's revenue stream from the Agreement terminates.

## HOW THE ELECTRONIC LICENSING TRANSACTIONS WORK

18.     It is very important to understand how the electronic licensing transactions work in order to understand the dispute at issue.  Assume the following hypothetical:  Joe is a Missouri resident and an insurance agent who wants to obtain a new license in three states:  Arizona, Missouri, and Minnesota.   Each state accepts online license applications, and each requires the same information to be input (e.g., name, address, existing licenses in other states, etc.).  Joe proceeds as follows:

### Example No. 1:  Missouri (SBS Back-End System)

Joe logs in at www.nipr.com to access the NIPR Front-End Portal.  He inputs the information and hits "send."  Joe is charged $5.00 by NIPR for this transaction.  NIPR sends the information to Missouri's back-end system, which is SBS and has been licensed to Missouri by NAIC.  Missouri's system then processes the application and sends Joe his license.  Because Missouri is a state which licenses SBS from NAIC, *Aithent is paid $2.50 by NAIC as its 50% royalty for this transaction, which is processed through SBS.*

### Example No. 2:  Arizona (Proprietary Back-End System)

Joe logs in at www.nipr.com to access the NIPR Front-End Portal.  He inputs the information and hits "send."  Joe is charged $5.00 by NIPR for this transaction.  NIPR sends the information to Arizona's back-end system, which is proprietary to Arizona.  Arizona's system

then processes the application and sends Joe his license. The NIPR Front-End Portal is completely separate from SBS. NIPR developed and owns the NIPR Front-End Portal, as it has since 1996. Neither NIPR nor Arizona license or use SBS. *Aithent does not receive a royalty on this transaction because the transaction is not processed within or through SBS.*

### Example No. 3: Minnesota (Sircon for States Back-End System)

Joe logs in at www.nipr.com to access the NIPR Front-End Portal. He inputs the information and hits "send." Joe is charged $5.00 by NIPR for this transaction. NIPR sends the information to Minnesota's back-end system, which is "Sircon for States", licensed to Minnesota by Sircon (now known as "Vertifore"). Minnesota's system then processes the application and sends Joe his license. The NIPR Front-End Portal is completely separate from SBS. NIPR developed and owns the NIPR Front-End Portal, as it has since 1996. Neither NIPR nor Minnesota license or use SBS. *Aithent does not receive a royalty on this transaction because the transaction is not processed within or through SBS.*

19.     From the beginning, NAIC has paid the full amount of royalties owing to Aithent under Example No. 1 above. NAIC has never paid royalties on Example Nos. 2 or 3, because these transactions are processed outside of SBS and therefore are not "Electronic Transactions" or "Net Revenue" upon which an "SBS Royalty Payment" is due, under the express terms of the Agreement. Aithent's claim in the primary Complaint is *not* that it has been underpaid on transactions described in Example No. 1; instead, Aithent's claim is that it is entitled to royalties on Example Nos. 2 and 3 because the NIPR Front-End Portal, which Aithent's Complaint refers to as "Gateway," is used as the front-end portal for the transaction.

### COUNT I
### (Declaratory Judgment)

20.     Aithent has brought this lawsuit against NAIC claiming that Aithent has not been paid proper royalties by NAIC under the terms of the Agreement.

21.     The royalty provision of the Agreement, and the related definitions, are as follows (the bold italics emphasis has been added):

§6(a)(i)   **Royalty to Aithent**:   In consideration of the rights granted by Aithent to the NAIC herein, the NAIC shall pay a

royalty ("SBS Royalty Payment") which shall be calculated as fifty percent (50%) of the *Net Revenue* received by the NAIC or NIPR, for the electronic transactions listed in *Exhibit A*, except that the SBS Royalty Payment shall not include Net Revenue for appointment/termination transactions with those State Insurance Departments identified in Exhibit D that are processing electronic appointment/termination transactions through NIPR prior to the Effective Date.

### (Definitions)

§1(h) **Net Revenue**:   In the case of the NAIC, total amount invoiced by the NAIC and its Affiliate NIPR for...*Transaction Fees*...

§1(l)   **Transaction Fee**:   Fees charged by the NAIC for each *Electronic Transaction in or through SBS* and which are to be apportioned between the Parties in accordance with the terms of this Agreement.

§1(a)   **Electronic Transaction**:   The electronic interaction *within SBS* between regulatory and non-regulatory persons and entities within the Insurance Sector with regard to a particular regulatory function including but not limited to non-resident licensing, non-resident licensing renewals, appointment renewals, resident licensing, resident licensing renewals and continuing education transactions.   *Exhibit A lists the initial categories (types) of Electronic Transactions.*   Such categories may be expanded by the addition of specific electronic transactions by mutual agreement of the Parties.

**Exhibit A:**   *The following Electronic Transactions, as this term is defined in the Agreement, will be included in SBS v. 1.0 and subject to the Royalty Payment as set forth in Section 6(a) of the Agreement*:   Non-Resident Licensing; Non-Resident Licensing Renewals; Appointment Renewals; Resident Licensing; Resident Licensing Renewals; and Continuing Education Transactions.

22.     The Agreement also specifically defines SBS:

**¶ 1(j) SBS:**   State-Based Systems, a web-based system *proprietary to the NAIC* providing software, tools, databases, and information to facilitate state insurance departments in their market conduct, licensing and solvency functions.

23.     Under these express terms, Aithent is entitled to a royalty only on "Transaction Fees" (which are *"in or through SBS")* for "Electronic Transactions" (which are *"within SBS").*

Transactions which may be processed by or thorough the NIPR Front-End Portal, but which are back-end processed by Sircon for States or a state proprietary system, are not processed "within SBS" or "in or through SBS," and therefore fall outside Aithent's royalty rights under the Agreement.

24.     NIPR was formed in 1996, long before Aithent and NAIC began negotiations for the LEO license. The NIPR Front-End Portal was up and running long before Aithent began developing LEO, and long before Aithent and NAIC began negotiations regarding the LEO license.

25.     Aithent knew all about NIPR and the NIPR Front-End Portal before signing the Agreement. The electronic transactions that were handled through NIPR were specifically and explicitly contemplated by the License Agreement in that Aithent is entitled to its 50% royalty on transactions going through NIPR if those transactions are conducted "within SBS" or "in or through SBS." NAIC has not paid to Aithent, and is not required to pay to Aithent, a royalty on transactions which are submitted through NIPR on the front end, and handled on the back-end by either Sircon for States or a state proprietary system.

26.     SBS is the only system created or used by NAIC based upon LEO.

27.     SBS is the only NAIC system which processes the licensing and appointment transactions defined in Exhibit A to the Agreement.

28.     Since the beginning in 2002, NAIC has sent monthly royalty reports to Aithent which show the source of revenue by transaction and state. Aithent has known from the beginning that it is not receiving royalties on transactions processed in states which have not licensed SBS.

29.     Only recently, within the last 12 months, has Aithent begun to question royalties on non-SBS state transactions. The eight year course of dealing in which Aithent willingly and knowingly accepted payments without complaint is important evidence that Aithent understood the terms as set forth above.

30.     The Agreement, both in letter and intent, is intended to compensate Aithent for NAIC's use of the LEO software and code. NAIC has always done that by paying to Aithent a royalty on any transaction which touches SBS. Neither the Agreement, nor any notion of fairness, gives Aithent a right to royalties on transactions which have nothing to do with SBS.

31.     Since 2003, Aithent has been paid over $5.5 million in royalties under the License Agreement, and millions more from related consulting fees.

32.     This Court has the power and authority to construe contracts and to decide issues arising thereunder, including the construction of disputed contract terms and the scope of Aithent's royalty right.

33.     NAIC is a party to the License Agreement and is therefore a properly interested party who may invoke this Court's power and authority to grant the declaratory relief sought herein.

34.     NAIC contends it has paid Aithent all royalties which Aithent is due under the License Agreement and otherwise fully performed all of NAIC's obligations under the License Agreement.

35.     A dispute and actual controversy has arisen and presently exists between NAIC and Aithent concerning the scope of Aithent's royalty rights and the other matters described above.

36.     NAIC desires a judicial determination and declaration of the parties' respective rights and obligations under the License Agreement.  A judicial determination pursuant to 28 U.S.C. §§2201-2202 and Fed. R.Civ.P. 57 is necessary and appropriate at this time.

37.     The declaratory judgment sought herein would terminate the uncertainty and controversy giving rise to this case.

38.     The License Agreement contains an attorneys' fees provision as follows:  "In the event a lawsuit results in a judgment (other than settlement), the prevailing Party shall be entitled to an award of reasonable attorneys' fees and expenses."  (Doc. 1, Ex. A, § 13).  Should NAIC prevail on this claim, it is entitled to an award of its reasonable attorneys' fees and expenses incurred.

WHEREFORE, NAIC prays for judgment in its favor and against Aithent on Count I of NAIC's Counterclaim as follows:

a)     A judicial declaration that NAIC owes no additional royalties to Aithent under the License Agreement and that NAIC has otherwise fully performed all of its obligations under the License Agreement;

b)     An award of NAIC's reasonable attorneys' fees and expenses incurred in this matter; and

c)     For such other and further relief as this Court deems just and proper.

## COUNT II

**(Injunctive Relief - Violation of NAIC's Exclusive Rights to LEO and ALiS)**

39.     NAIC repeats and realleges the allegations contained in paragraphs 1 through 38 of this Counterclaim as though fully set forth herein.

Case 4:11-cv-00173-GAF   Document 89-5   Filed 09/04/13   Page 19 of 24

40.     The Agreement gives the NAIC a "perpetual...irrevocable, exclusive right to make, use, reproduce, modify, adapt, create derivative works based on, translate, distribute, transmit, and display LEO within the Insurance Sector...." (Doc. 1, Ex. A, §2(a)).

41.     The Agreement also gives NAIC a "perpetual, non-transferable, irrevocable exclusive license solely within the Insurance Sector to any future enhancements, modifications, derivative works, and updates to LEO developed by Aithent." Id., §2(b).

42.     Aithent has developed, and is marketing, offering for sale, and selling a software product known as Aithent Licensing Solution ("ALiS.")

43.     Upon information and belief, ALiS is, in whole or in part, an enhancement, modification, derivative work and/or update to LEO.

44.     Aithent has described ALiS as follows:

> In 2007, New York State selected Aithent to build a solution for its regulatory needs. The solution has been partially deployed in New York State with complete deployment scheduled for Q3 2008. Aithent is committed to this market and has invested in the development of the next generation solution, Aithent Licensing System or ALiS which has evolved from LEO and still utilizes its competencies at the core with additional services around it.

45.     ALiS is specifically targeted to state insurance regulators. Aithent sells, offers for sale, and markets ALiS within the Insurance Sector, as that term is defined in the Agreement. (Doc. 1, Ex. A, § 1(b)).

46.     By developing and selling ALiS, Aithent is violating the exclusive license given to NAIC within Insurance Sector for LEO and its enhancements and derivative works.

47.     NAIC has performed all of its obligations under the Agreement.

48.     Aithent has recently been awarded a contract from the State of Michigan to provide ALiS as the regulatory software for that state's insurance department.

49. Aithent's violations of NAIC's exclusive rights to LEO and its derivative works, have caused and, unless enjoined by this Court, will continue to cause, irreparable injury and harm to NAIC. NAIC has no adequate remedy at law.

WHEREFORE, NAIC prays for judgment in its favor, and against Aithent, on this Count II, as follows:

a) For permanent injunctive relief preventing, prohibiting, and restraining Aithent (including its officers, directors, employees, agents, and those in active concert with it) from making, using, reproducing, modifying, adapting, creating derivative works, translating, distributing, displaying, selling, offering for sale, supporting, and/or marketing ALiS, LEO, and all other products which are an enhancement, modification, derivative work, or update of LEO, within the Insurance Sector;

b) An award of NAIC's reasonable attorneys' fees and expenses incurred in this matter; and

c) For such other and further relief as this Court deems just and proper.

## COUNT III
**(Set Off for Aithent's Breach of the License Agreement – Deficient Product and Code)**

50. NAIC repeats and realleges the allegations contained in paragraphs 1 through 49 of this Counterclaim as though fully set forth herein.

51. Under the Agreement, Aithent was required to deliver LEO, and its source code, to NAIC in order to serve as the foundation for the development of SBS.

52. The quality of the LEO product delivered by Aithent was grossly inadequate, deficient and not as represented by Aithent. As delivered, LEO had substantial deficiencies and lacked important functionalities.

53.     In addition, Aithent failed and refused to deliver certain components of the LEO source code to NAIC for many months.

54.     Aithent's poor quality LEO product and code, and its untimely delivery, impeded NAIC's ability to work with LEO, and also substantially set back the development, quality, functionality and marketability of SBS.

55.     Exhibit B to the Agreement lists specifications and requirements for LEO. The LEO product delivered by Aithent failed to meet many of these specifications and requirements.

56.     Among its many problems and deficiencies, LEO did not function as an enterprise system, as was intended.

57.     In addition, the Crystal Reports tool in LEO was out of date at the time Aithent delivered it to NAIC. NAIC subsequently discovered that the Crystal Reports tool, as delivered, was a trial code and not properly licensed by Aithent. Therefore, it could not be implemented in a production environment.

58.     In addition, LEO was represented as having table-driven code, which would allow for great efficiencies in the implementation and use of SBS by the states. NAIC subsequently discovered that, in fact, LEO did not have table-driven code, which made the implementation process much more lengthy, inefficient, and costly.

59.     In addition, LEO, as delivered by Aithent, had serious security flaws. For example, the code allowed one state to retrieve information belonging to another state, some of which was confidential. This flaw potentially compromised the regulatory processes of the involved states.

60.     The LEO code, as it was to be delivered, consisted of three separate components: LION web; security; and a work flow engine, or computer processing engine ("CPE"). As

Case 4:11-cv-00013-GAF Document 89-5 Filed 03/04/13 Page 22 of 24

delivered, NAIC received only the LION web component. It was not until late spring of 2003 that Aithent agreed to deliver the security component and the CPE.

61.    Aithent's failure to deliver satisfactory code constituted a breach of Aithent's obligations under the Agreement.

62.    NAIC has fully performed all of its obligations under the Agreement.

63.    The Agreement is a valid and binding contract.

64.    As a direct and proximate result of Aithent's breach, NAIC has suffered damages in an amount to be determined at trial. To the extent NAIC recovers on this count, it is to be used as a set-off of any amounts determined to be owing to Aithent under its claims in the Complaint.

**WHEREFORE**, NAIC prays for judgment in its favor and against Aithent, on Count III of its Counterclaim, as follows:

a)    For all damages suffered by NAIC by reason of Aithent's breach, to be used as a set-off against any sums awarded to Aithent on the claims in its Complaint;

b)    An award of NAIC's reasonable attorneys' fees and expenses incurred in this matter; and

c)    For such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

NAIC hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

HUSCH BLACKWELL LLP


/s/ Jeffrey J. Simon
Jeffrey J. Simon          MO# 35558
Stephen J. Torline        MO# 49483
4801 Main Street, Ste 1000
Kansas City, MO 64112
Telephone (816) 983-8000
Facsimile (816) 983-8080
jeff.simon@huschblackwell.com
stephen.torline@huschblackwell.com

Attorneys for Defendant National Association of
Insurance Commissioners

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was forwarded on March 9, 2011, via the Court's CM/ECF electronic notification system, to:

Gregory P. Goheen
McAnany VanCleave & Phillips, P.A.
10 E. Cambridge Circle Drive, Suite 300
P.O. Box 171300
Kansas City, KS 66117
ggoheen@mvplaw.com

Peter Gallagher
Steven Johnson
Kennedy Johnson Gallagher, LLC
99 Wall Street, 15th Floor
New York, NY 10005
pgallagher@kjglaw.com
sjohnson@kjglaw.com


/s/ Jeffrey J. Simon