**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| **AITHENT, INC.,** )<br>)<br> **Plaintiff,** )<br>)<br>**vs.** )<br>)<br>**THE NATIONAL ASSOCIATION** )<br>**OF INSURANCE COMMISSIONERS,** )<br>)<br> **Defendant.** ) | **Case No. 11-00173-CV-W-GAF** |

**ORDER**

Presently before the Court is Plaintiff Aithent, Inc.'s ("Plaintiff") Motion for Summary Judgment as to Counts I through IV of its Complaint (Doc. # 93) pursuant to Federal Rule of Civil Procedure 56.[1]   (Doc. # 90).   Defendant The National Association of Insurance Commissioners' ("Defendant") opposes.  (Doc. # 115).  Also before the Court are Defendant's Motions for Summary Judgment as to Counts I, II, III, and V, pursuant to Federal Rule of Civil Procedure 56.  (Docs. ## 84, 86).  Plaintiff opposes.  (Docs. ## 111, 113).  For the reasons set forth below, Plaintiff's Motion is DENIED and Defendant's Motions are GRANTED in part and DENIED in part.

**DISCUSSION**

---

[1] On February 25, 2013, the Court granted Defendant's Motion for Summary Judgment as to Count IV and denied Plaintiff's Motion for Summary Judgment as it related to Count IV.  (Doc. # 126).  In Plaintiff's Reply to its Motion for Summary Judgment, Plaintiff requests that the Court reconsider its Order granting Defendant summary judgment as to Count IV.  (Doc. # 126, pp. 83-87).  The Court is not bound to consider matters raised for the first time in a reply brief. *Barham v. Reliance Standard Life Ins. Co.*, 441 F.3d 581, 584 (8th Cir. 2006) (citation omitted). Further, because this request was made in Plaintiff's reply brief, Defendant did not have an opportunity to respond to it and the Court need not consider it.  *See Sowers v. Gatehouse Media Mo. Holdings, Inc.*, No. 4:08CV633 TIA, 2010 WL 1633389, at *2 (E.D. Mo. Apr. 22, 2010) (citing *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164-65 (10th Cir. 1998); *Black v. TIC Inv., Corp.*, 900 F.2d 112, 116 (7th Cir. 1990)).

Plaintiff is a technology company, incorporated in New York, that develops and implements software systems. (Complaint ¶¶ 1, 12). Defendant is an association of insurance regulatory officials from all fifty (50) states, including the District of Columbia and five (5) U.S. territories, incorporated in Delaware. (*Id*. ¶¶ 3-4). This action involves a License Agreement between the parties to develop a software system to assist state insurance departments

## I.    FACTS[2]

State insurance departments perform insurance consumer services and regulatory functions. (*See* August 19, 2002, Memorandum ("8/19/02 Mem."), 1). The departments license insurance agents and brokers, called producers, who sell insurance in their state. (Defendant's Statement of Facts as to Counts I, II, and V ("DSoF I") ¶ 15). The act of licensing a producer in a state is called a producer licensing transaction. (*Id*.). Producer licensing transactions include appointments and appointment renewals, terminations, resident licensing and renewals, non-resident licensing and renewals, and continuing education transactions. (*Id*. ¶ 16). State insurance departments also handle other regulatory functions, such as consumer complaints, regulatory actions, fraud investigations, examinations, rate and form filings, and revenue management. (*See* July 2001 Proposal, 3; November 10, 2006, Historical Overview and Proposed Strategies ("2006 SBS Overview"), 5-9).

A state insurance department either licenses, purchases, or develops its computer system for its regulatory and licensing functions. (8/19/02 Mem., 3). There are two (2) types of systems used to process a state insurance department's licensing functions: a front-end system and a back-office system. (DSoF I ¶¶ 17, 50). A front-end system is "a piece of technology that collects information from one end-user and transmits it in a form compatible with a separate

---

[2] When the Court cites to a party's statement of facts, those facts are declared uncontroverted by the opposing party and the Court considers them undisputed.

system used by different end-users." (*Id.* ¶ 50). A back-office system handles "producer and company information to ensure compliance with the regulations state insurance departments are charged to enforce." (*Id.* ¶ 17). There are three (3) types of back-office systems: (1) state-developed; (2) Sircon for States ("Sircon"); and (3) State Based Systems ("SBS"). (*Id.* ¶¶ 33, 51). The front-end and back-office systems operate together: the front-end system accepts transactions, such as producer licensing transactions, from insurance producers and companies and, thereafter, transmits the information to a state insurance department's back-office system. (*Id.* ¶ 51).

## A.    The Early Insurance-Related Software Systems

### 1.    LION and LEO

Plaintiff developed the Licensing Information Online Network ("LION") in 1996 for the New York State Insurance Department ("NYSID"). (License Agreement § 1(d); Plaintiff's Statement of Facts as to Counts I through IV ("PSoF") ¶ 1). NYSID used LION to manage its regulatory requirements, including the licensing of producers to sell insurance in New York. (*Id.* ¶ 2). Initially, LION was designed only for back-office use in state insurance departments. (*See id.* ¶¶ 3, 6). Prior to 2001, Plaintiff enhanced LION into "LION Web" to have a front-end system to be used in conjunction with LION's back-office system. (*Id.* ¶ 6). During 1999 and 2000, Plaintiff began developing the Licensing Environment Online ("LEO"), and by 2001 it began marketing its first version of LEO. (*Id.* ¶ 7). LEO was "a proprietary web-based system developed by [Plaintiff] to electronically accept, process and manage state licensing and regulatory information." (License Agreement § 1(c); DSoF I ¶ 81).

### 2.    SERFF

"State laws generally require that, before an insurance company may sell or amend any policy . . . in a state, the form of that policy must be submitted to . . . that state's insurance department." (DSoF I ¶ 70). Many states also require rates associated with insurance policies and products be reviewed and approved by the state's insurance department before being offered to the public. (*Id*. ¶ 71). In the mid 1990s, Defendant developed a web-based system called the System for Electronic Rate and Form Filing ("SERFF") to allow insurance companies to send rate and form submissions electronically to state insurance departments. (*Id*. ¶¶ 67, 73). "By the end of 2001 . . . [Defendant] had licensed SERFF to all 50 states, and it had been used for years to handle rate and form electronic transactions." (*Id*. ¶ 75). SERFF does not handle any producer licensing transactions. (*Id*. ¶¶ 68, 69). Defendant eventually offered an SBS Rate and Form Module that integrated SERFF. (*See* April 2003, NAIC/Aithent Meeting Agenda ("4/2003 Meeting"), Bates No. NAI01236; SBS Rate and Form Flier; 2008 PowerPoint, 6).

### 3.    *Gateway*

Defendant formed the National Insurance Producer Registry ("NIPR") in 1996 "to further the regulatory activities of [Defendant's] members as it related to producer licensing." (DSoF I ¶ 38). NIPR is a non-profit affiliate of Defendant incorporated in Missouri. (*Id*. ¶¶ 36, 37). In the 1990s, Defendant developed an electronic network called the Producer Information Network ("PIN"), which transmitted data about producers to and from the states. (PSoF ¶ 12). After NIPR was formed, NIPR developed an enhanced version of PIN, called Gateway, to promote uniformity and streamline producer licensing activities. (*Id*.; DSoF I ¶¶ 43, 44). Defendant licensed to NIPR the intellectual property that was the foundation for Gateway and provided NIPR financial support, services, and equipment to develop Gateway. (PSoF ¶ 15).

Gateway has two (2) sets of applications: "NIPR Gateway" applications and "NAIC Gateway" applications. (2006 Mutual Assignment of Rights ("2006 NIPR/NAIC Assignment"), Exhibits A and B). Defendant owned the NAIC Gateway applications and NIPR owned the NIPR applications. (2006 NIPR/NAIC Assignment §§ 1(B) and 2(B)).

Initially, Gateway had limited capabilities. By February 2002, Gateway only transmitted appointments, terminations, and non-resident licenses. (PSoF ¶ 17; DSoF I ¶ 53; Deposition of Maryellen Waggoner ("Waggoner Depo.") 72:12-20). Today, Gateway is a front-end system for all producer licensing transactions. (DSoF I ¶ 50). To use Gateway, "an agent or company can go to www.nipr.com and complete the information required by the online forms for the producer licensing transaction they choose. Once completed, the agent or company submits the information in the form to . . . Gateway . . . . [and] Gateway then transmits the information to [a] state's back office system." (*Id*. ¶ 52). Gateway transmitted transactions to any back-office system, regardless of the type. (*Id*. ¶¶ 51-52). Gateway did not perform any back-office system processing that back-office systems, like SBS, did for state insurance departments. (*Id*. ¶ 133).

**B.      SBS**

Defendant desired to develop SBS to be "available for any state to use for **all** their internal processing for the department of insurance" and "provide one uniform system that could be used to complete the majority of any states regulatory tasks." (July 2001 Proposal, 3; 8/19/02 Mem., 3). Defendant proposed offering state insurance departments different "SBS Applications" or "Modules." (State Based System Project Summary ("SBS Summary"), 1); July 2001 Proposal, 3). The proposed Modules included Producer Licensing, Company Admissions and Tracking, Continuing Education, Consumer Services, Investigations and Fraud, Revenue Management, Rates and Forms Filings, Examinations Tracking, Financial Analysis, and System

Security and Utilities. (July 2001 Proposal, 3). The first Module Defendant developed was the Producer Licensing Module. (*See* SBS Summary; July 2001 Proposal; June 14, 2001, Memorandum ("6/14/01 Mem.")). Originally, Defendant envisioned that this Module would be built to interface with Gateway. (*Id*. at 4).

Beginning in July 2001, Defendant researched ways to develop SBS. (DSoF I ¶ 79). Defendant had conversations with three (3) "vendors," including Sircon, Bisys, and Plaintiff, about partnering with Defendant to create SBS from established software in lieu of developing SBS "in-house."[3] (October 3, 2001, Memorandum ("10/3/11 Mem."), 1). Plaintiff's system had the most parallels to what Defendant envisioned for SBS. (*Id*. at 2). Defendant opted to work with Plaintiff and use LEO as the foundation for SBS. (DSoF I ¶ 79).

### 1. The License Agreement[4]

On July 15, 2002, Plaintiff and Defendant entered into a License Agreement whereby Plaintiff exclusively licensed LEO to Defendant. (*Id*. ¶¶ 5, 80; License Agreement, Recitals). The License Agreement provided:

**RECITALS**
* * *

D. [Defendant] desires to develop State-Based Systems ("SBS"), a secured proprietary web-based system providing software, tools, databases, and information to provide participating state insurance departments market conduct, licensing and solvency functions; and

E. The Parties desire to license to [Defendant] the exclusive rights in LEO within the Insurance Sector . . . , so that LEO shall be used as the basis for the development of SBS.
* * *

### 1. DEFINITIONS

---

[3] The October 3, 2001, Memorandum refers to Innovative IT, Sircon's predecessor. The Court will refer to Innovative IT as Sircon.

[4] The parties entered into a Master Services Agreement ("MSA") simultaneously. (*See* Master Services Agreements ("MSA")).

a. **Electronic Transaction:** the electronic interaction within SBS between regulatory and non-regulatory persons and entities within the Insurance Sector with regard to a particular regulatory function including but not limited to non-resident licensing, non-resident licensing renewals, appointment renewals, resident licensing, resident licensing renewals and continuing education transactions. Exhibit A lists the initial categories (types) of Electronic Transactions. Such categories may be expanded by the addition of specific Electronic Transaction by mutual agreement of the Parties.

* * *

e. **License Fees:** fees which may be charged by [Defendant] to SBS users for the non-exclusive right to access and use SBS . . . .

* * *

h. **Net Revenue:** . . . the total amount invoiced by [Defendant] and its Affiliate NIPR for License Fees and Transaction Fees . . . .

* * *

j. **SBS:** State-Based Systems, a web-based system proprietary to [Defendant] providing software, tools, databases, and information to facilitate state insurance departments in their market conduct, licensing and solvency functions.

k. **State Insurance Departments:** a state insurance department that has signed an SBS License Agreement and paid all applicable fees.

l. **Transaction Fee:** fees charged by [Defendant] for each Electronic Transaction in or through SBS and which are to be apportioned between the Parties . . . .

## 2. EXCLUSIVE LICENSE TO [DEFENDANT]

a. [Plaintiff] hereby grants, and [Defendant] hereby accepts, a[n] . . . exclusive right to make, use, reproduce, modify, adapt, create derivative works based on, translate, distribute, transmit, and display LEO within the Insurance Sector solely for the purpose of development, implementation, operation, modification, enhancement and maintenance of SBS ("SBS License"). . . . [T]he SBS License shall include the right to [Defendant] to use, access, modify, reverse engineer, decompile, and create derivative works based on the LEO source code solely for the purposes set forth above.

* * *

## 4. DELIVERY OBLIGATIONS

a. [Plaintiff] represents and warrants that LEO, when delivered to [Defendant], will meet the specifications and requirements provided in Exhibit B . . . .

b. [Plaintiff] shall deliver LEO . . . to [Defendant] . . . .

* * *

d. LEO shall be used as the foundation in the development, implementation, operation, maintenance and enhancement of SBS.

* * *

5. **TITLE AND OWNERSHIP**

    a.  [Plaintiff] owns all proprietary right, title and interest in and to LEO . . . . [Plaintiff] retains all right, title, and ownership to any modifications to, derivative works of and improvements to LEO made by [Defendant] of [its] affiliates and agents . . . provided that the development, implementation, modification, and enhancement of SBS shall not be considered a modification to, derivative work of, or improvement to LEO.

* * *

    b.  [Defendant] owns all proprietary right, title and interest in and to SBS . . . . [Defendant] retains all right, title, and ownership to any modifications to, derivative works of and improvements to SBS made by [Plaintiff] or its agents, whether or not authorized, provided that the development, implementation, modification, and enhancement of LEO shall not be considered a modification to, derivative work of, or improvement to SBS.

* * *

6. **COMPENSATION**

    **a.  Royalty to [Plaintiff]**

        (1)  In consideration of the rights granted by [Plaintiff] to [Defendant] herein, [Defendant] shall pay a royalty ("SBS Royalty Payment") which shall be calculated as fifty percent (50%) of the Net Revenue received by [Defendant] or NIPR, for the Electronic Transactions listed in Exhibit A, except the SBS Royalty Payment shall not include Net Revenue for appointment/termination transactions with those State Insurance Departments . . . that are processing electronic appointment/termination transaction through NIPR prior to the Effective Date.

* * *

        (2)  Each time a State Insurance Department implements an Electronic Transaction using SBS, the SBS Royalty Payment for that State Insurance Department's Electronic Transaction shall be due for a period of five (5) years from the date of first implementation of such Electronic Transaction (the "SBS Royalty Period").

* * *

        (3)  The SBS Royalty Payment shall be due on a monthly basis . . . . Each SBS Royalty Payment . . . shall be accompanied by a detailed statement in a format . . . itemizing the number of Electronic Transactions by State Insurance Department corresponding to the License Fees and Transaction Fees.

        (4)  [Defendant] and NIPR shall have sole discretion to establish, increase or decrease License and Transaction Fees for SBS within the Insurance Sector . . . . Notwithstanding the foregoing, the price of a Transaction Fee for the transactions listed in Exhibit A shall not be reduced by more than fifteen percent (15%) during any calendar year unless otherwise mutually agreed to by the Parties.

        (5)  [Defendant] shall make reasonable efforts to market SBS.

* * *

**7. TERM AND TERMINATION**

    a. In the event of a material breach of this Agreement . . . the following conditions shall apply:

      (1) If the breaching Party is [Defendant],

* * *

        (b) . . . [Plaintiff] may immediately terminate [Defendant's] exclusive rights under the Agreement. [Defendant] may continue to use the LEO software licensed under the SBS License.

* * *

        (c) . . . [Defendant] may continue to use the LEO software licensed under the SBS License only in those States with SBS licenses in effect as of the date of [Plaintiff's] written notice of breach to [Defendant]. . .

* * *

**8. TRADEMARKS; COPYRIGHTS**

    a. During the term of this Agreement, [Defendant] shall at all times display the "Powered by Aithent" symbol, [Plaintiff's] trademark, logo and trade name ("Aithent Marks") on SBS and . . . shall include the Aithent Marks on the SBS splash screen and log-in screens.

* * *

    b. In displaying [Defendant's] copyright notices and designation of SBS, [Defendant] shall at all times include appropriate and complete copyright information with respect to LEO components and modifications included in SBS by indicating that a portion of SBS includes copyrighted material of [Plaintiff] on, at a minimum, the "About" display or its equivalent.

* * *

**14. GOVERNING LAW**

    By adoption of the Parties, the State of New York is deemed to be the place of contracting and by agreement of the Parties, any claim . . . relating to this Agreement, its interpretation, performance or validity shall be construed and governed in accordance with the laws of the State of New York . . . .

* * *

**24. ENTIRE AGREEMENT**

    This Agreement constitutes the entire agreement of the Parties on this subject matter, and supersedes all prior agreements, understanding and proposals, oral or written, between the Parties. No amendments or modifications to this Agreement shall be valid unless in writing and signed by both Parties.

### <u>EXHIBIT A</u>

    The following Electronic Transactions, as this term is defined in the Agreement, will be included in SBS [version] 1.0 and subject to Royalty Payment as set forth in Section 6(a) of the Agreement.

### <u>Type of Electronic Transaction</u>

Non-Resident Licensing

Non-Resident Licensing Renewals
Appointment Renewals
Resident Licensing
Resident Licensing Renewals
Continuing Education Transactions

This Exhibit may be amended from time to time upon mutual written agreement of the Parties.

(License Agreement).

Other facts are relevant to the parties' License Agreement. First, LEO was never used in Gateway or SERFF. (DSoF I ¶¶ 46, 76). Additionally, "[t]he rate and form transactions [that] SERFF processe[d] [were] not among the types of transactions listed on Exhibit A of the [License] Agreement . . . nor [was] SERFF mentioned anywhere in the [License] Agreement." (DSoF I ¶ 77). Further, the parties never amended Exhibit A by written agreement, though Plaintiff contends it was amended by conduct. (*Id*. ¶ 106; Plaintiff's Response to DSoF I ¶ 106). Finally, Defendant admits to paying Plaintiff royalties on transactions not listed in Exhibit A processed by SBS, including appointments, terminations, and non-resident adjuster licensing. (Doc. # 122, p. 24).

## 2. *Licensing, Implementing, and Using SBS Generally*

A state insurance department must license and implement SBS before it can use SBS. (DSoF I ¶ 136). Once licensed, Defendant implemented SBS on servers hosted by Defendant. (*Id*. ¶¶ 31, 127). Defendant "work[ed] with the state's personnel to migrate data, incorporate state rules, and configure[d] SBS so that the state insurance department [could] use SBS to accept Exhibit A [Electronic] Transactions" according to that state's particular regulations. (*Id*. ¶¶ 31, 127-28). Additionally, a state insurance department could customize its SBS back-office system by choosing Modules it desired and could add more Modules later. (2008 PowerPoint, 4; 2006 SBS Overview, 5-9; Deposition of Julienne L. Fritz ("Fritz Depo.") 300:2-4). A state

insurance department could also customize which producer licensing transactions it desired to process in its SBS back-office system. (DSoF I ¶¶ 130-31).

After a state insurance department licensed and implemented SBS, a producer could submit a producer licensing transaction to that insurance state department in one (1) of two (2) ways: (1) some states insurance departments had front-end functionality with SBS and allowed a producer to go directly to the state insurance department's website to submit a particular Exhibit A Electronic Transaction; or (2) a state insurance department accepted an Exhibit A Electronic Transaction from producers through Gateway that thereafter transmitted the Exhibit A Electronic Transaction to the state insurance department's SBS back-office system. (*Id*. ¶¶ 34-35, 51-52, 135). The parties described SBS's front-end functionality as "limited," meaning "SBS'[s] limited front-end functionality [did] not allow insurance companies and producers in a particular state [that licensed SBS] to send any transactions to state back-office systems other than that SBS state." (*Id*. ¶¶ 59-60, 134).

### 3. *The Developing and Marketing of SBS*

#### a. *2002-2006*

Shortly after executing the License Agreement, Defendant began entering into SBS License Agreements with state insurance departments. (DSoF I ¶ 124). By January 2003, four (4) states or jurisdictions licensed SBS. (December 10, 2010, SBS Overview ("2010 SBS Overview"), Bates No. NAI_E478791). Between approximately January 2003 and the end of 2006, Defendant licensed SBS to only one (1) additional state insurance department. (*See* 2010 SBS Overview, Bates Nos. NAI_E478791 – NAI_E478792). During these years, Defendant charged a one-time implementation fee, varying between $94,736 and $184,493. (Delaware SBS

License Agreement ("DE Agreement") § 5; New Jersey SBS License Agreement ("NJ Agreement") § 5; Rhode Island SBS License Agreement ("RI Agreement") § 5).

Plaintiff and Defendant "worked together in the latter part of 2002 to convert LEO into SBS." (PSoF ¶ 64). In 2002 and 2003, SBS offered a limited number of Modules. The Modules offered included Producer Licensing, Company, Enterprise, and State Administration Modules. (DE Agreement, Exhibit A; NJ Agreement, Exhibit A; RI Agreement, Exhibit A).

Originally, Defendant assumed "SBS would be designed to process license transactions through . . . Gateway." (December 2, 2002, Memorandum ("12/2/02 Mem."), 1). However, when Defendant received LEO, Defendant realized LEO "already included a complete, functional resident and non-resident licensing interface that communicated directly with the underlying state database" and it concluded that "[m]odifying [LEO's] design for non-resident license transactions to funnel all transactions through [Gateway] would have caused delays and . . . costs." (*Id.*). By April 2003, however, SBS's front-end system was not ready and state insurance departments needed that capability. (April 3, 2003, Letter ("4/3/03 Letter"), 2). To solve the "dilemma," Defendant "worked with NIPR to acquire the rights to use its non-resident licensing [front-end system, Gateway.]" (*Id.*).

Defendant and NIPR entered into a Use and Services Agreement for SBS in 2003, whereby Gateway would be used in SBS's Producer Licensing Module. (2003 Use & Services Agreement ("2003 NIPR Agreement") § 1). NIPR and Defendant had a revenue-sharing scheme for revenues received by NIPR for all transactions generated through Gateway for SBS-licensed states: NIPR retained 45% while Defendant received 55%. (*Id.* § 5(d)). They altered the revenue-sharing scheme in 2006 so that Defendant received 30% of NIPR's revenue. (*See* 2006

Licenses and Services Agreement ("2006 NIPR Agreement") § 9(b)(i); August 26, 2010, Summary ("8/26/10 Summary"), 2).

Also during this time period, Defendant indicated to Plaintiff it was encountering budget constraints. Within eight (8) months after entering into the License Agreement and MSA, Plaintiff had already provided the 1000 complementary service hours to Defendant, the total amount allotted for Defendant in the MSA, and Defendant paid to Plaintiff over $635,000 in consulting fees. (4/3/03 Letter, 1.). In an email sent to Plaintiff in 2004, Defendant indicated it was facing difficulties licensing SBS to state insurance departments. (December 15, 2004 Email ("12/15/04 Email"). Some state insurance departments' budgets were being cut and could not find money to implement SBS. (*Id*.). Other departments stated SBS was not "robust enough to support their needs," to which Defendant told Plaintiff it "must" develop "several key modules, such as revenue management and market regulation, . . . before these states will seriously consider moving to SBS." (*Id*.). To defray Defendant's budget constraints due to high consulting fees and few state licenses, Defendant decided to no longer include consulting expenses for Plaintiff until a new state signed an agreement. (*Id*.). Defendant stated it could not "continue to incur consulting expenses without the implementation fees from new states." (*Id*.).

By 2005, both Gateway and the SBS front-end systems could process non-resident and resident licensing, as well as their renewals. (March 22, 2005, Email ("3/22/05 Email"), 1). Defendant told Plaintiff in March that all non-resident licensing would be "funnel[ed]" through Gateway because NIPR had access to all state resident information for non-resident license processing. (*Id*.). Resident licensing and renewals, however, could still be processed with an SBS front-end system because resident licensing only involved information pertinent to that state. (*Id*.).

In 2005 and 2006, Defendant attempted to "better position SBS" by offering lower transaction fees and eliminating implementation fees. (*See* 3/22/05 Email, 2; 2006 SBS Overview, 15). In 2005, Defendant requested that Plaintiff agree to lowering transaction fees. (3/22/05 Email, 1-2). NIPR had recently lowered its rate for non-resident licensing transactions transmitted from Gateway to an SBS back-office system from $10 to $8.55. (*Id*. at 1). NIPR also added other licensing transactions and charged $2.50 per transaction when transmitted to SBS back-office systems. (*Id*.). Defendant charged $10 per transaction when a producer used an SBS front-end system. (*Id*.). According to Defendant, if the SBS fees were not lowered, producers would use Gateway instead of an SBS front-end system. (*Id*.).

In 2006, Defendant suggested that SBS would be licensed to more state insurance departments if it removed the implementation fee and offered SBS at no cost to state insurance departments. (2006 SBS Overview, 15). Early on, SBS was unique in the marketplace and Defendant "could offer [SBS] at a reduced cost as compared to other solutions." (*Id*. at 11). However, Sircon began offering a similar product to SBS but for free. (*Id*.). Defendant also stated that SBS was unlike its other initiatives because it required state insurance departments to pay upfront costs. (*Id*.). Defendant used SERFF as an example: when Defendant initially offered SERFF, it charged an upfront fee but only saw minimal state participation for the first two (2) to three (3) years; when the fee was removed, all states licensed SERFF within two (2) years. (*Id*.). According to Defendant, if it removed the costs to implement SBS, SBS could have that same potential. (*Id*.).

That same year, Defendant indicated it offered the following services to state insurance departments: SBS Producer, SBS Continuing Education, SBS Company, SBS Consumer Services, SBS Enforcement, SBS Revenue, SBS Rate and Form, SBS Correspondence, SBS

Producer Lookup, SBS Resident Licensing, SBS Resident Licensing Renewals, SBS Online Licensee Services, NIPR Non-Resident Licensing, NIPR Non-Resident Renewals, and NIPR Appointments and Terminations. (2006 SBS Overview, 5).

Defendant appeared to offer little support via marketing early on. Between 2002 and 2004, Defendant only spent $8,800.31 on marketing. (SBS 2002-2009 Revenue/Expense Summary ("2002-2009 Summary"), 3-5). From 2002 to 2004, by contrast, Defendant's gross revenue was over $171 million. (2002 NAIC Annual Report, Bates No. NAI_E000227; 2003 NAIC Annual Report, Bates No. NAI_E000266; 2004 NAIC Annual Report, Bates No. NAI_E000216). However, Defendant spent more money on marketing in 2005 and 2006: $30,017.56 and $51,101.00, respectively. (2002-2009 Summary, 6-7).

### b. *2007-Present*

Sometime prior to November 2007, Gateway was processing all producer licensing transactions. (*See* Alabama SBS Licensing Agreement ("AL Agreement"), 1 and Exhibit F). Defendant's SBS licensing agreements in 2007 provided that the state insurance department must agree "that where SBS and NIPR offer the same producer licensing and renewal transaction services, [the state] shall first utilize NIPR functions and products." (*See id*. § 6). Exhibit F stated that a link to NIPR would be provided on the state's insurance department website. (*Id*. at Exhibit F). However, the Agreement also stated that SBS would have the "[a]bility to receive . . . original and renewal, resident and non-resident license applications submitted electronically from SBS online services, which will be linked from the State's web site," indicating the SBS front-end system would have the same capability as Gateway. (*Id*.).

By 2007, defendant no longer charged an implementation fee. (*See id* § 5). Additionally, transaction fees were lowered for Gateway transactions transmitted to an SBS back-office system and for SBS front-end systems. (*See id*. at Exhibit G).

Between 2007 and 2008, Defendant added more Modules to SBS, including SBS Complaints, SBS Fraud, SBS Project Tracking, SBS Regulated Industry Services, SBS NAIC System Integrations, SBS Reports, and I-SITE integration. (*Id.* at Exhibit A; 2008 PowerPoint, 5-6). By 2011, Defendant added other Modules, including Exams, Investigations, and Health Care Review. (*See* 2010 SBS Overview, Bates Nos. NAI_E478804 – NAI_E478805).

In 2008, Defendant experienced difficulties licensing SBS with state insurance departments because eighteen (18) states at that time already used Sircon. (2008 PowerPoint, 3). Up until 2008, Sircon was more successful than SBS at adding states. (*Id*. at 7). Defendant stated, "Sircon tend[ed] to have a more interactive relationship with their states than [Defendant]" and Sircon "[did] not depend on a 'third party (ie, NIPR)' to provide any support." (*Id*.). However, Defendant added more states than Sircon in 2007. (*Id*.).

Nonetheless, the amount of states that licensed SBS during this time period increased. Defendant licensed SBS to six (6) additional state insurance departments in 2007, for a total of eleven (11) states. (2010 SBS Overview, Bates No. NAI_E478793). In 2008, Defendant licensed SBS to fifteen (15) total state insurance departments. (*Id*. at Bates No. NAI_E478794). Four (4) more state insurance departments licensed SBS in 2009 and two (2) more did in 2010. (*Id*. at Bates Nos. NAI_E478795 – NAI_E478796). Today, twenty-five (25) state insurance departments have licensed SBS. (DSoF I ¶ 33). Funds for marketing increased during this period, as well. Defendant spent $56,136 in 2007; $59,389.44 in 2008; and $61,036.94 in 2009 on marketing. (2002-2009 Summary, 8-10).

### 4. Revenues-Sharing and Royalty Payments

Defendant testified that the SBS back-office system was for internal state processing only and was not designed to be revenue-generating. (Fritz Depo. 299:14-18). Revenues were generated based on transactions through the front-end systems. (*See id*. at 299:11-12). As of 2008, only the Producer and Continuing Education Modules generated revenue and state insurance departments were not obligated to add those Modules to their SBS back-office system. (2008 PowerPoint, 4). Between 2002 to 2009, Defendant claims it earned $5,245,468 and incurred as costs $15,265,199 from SBS, for a net loss of $10,019,731. (2002-2009 Summary, 2).

If a producer initiated an Exhibit A Electronic Transaction using Gateway that was thereafter transmitted to an SBS back-office system, Defendant paid Plaintiff an SBS Royalty Payment. (DSoF I ¶¶ 61-64). Likewise, if a producer initiated an Exhibit A Electronic Transaction using SBS's limited front-end system that was thereafter transmitted to an SBS back-office system, Defendant paid Plaintiff an SBS Royalty Payment. (*Id*. ¶ 61). If a rate and form transaction was processed by SERFF, Defendant did not pay an SBS Royalty Payment. (*See id*. ¶ 149). If a producer initiated a producer licensing transaction using Gateway that was thereafter transmitted to a non-SBS back-office system, Defendant did not pay an SBS Royalty Payment. (*Id*. ¶ 151). On at least two (2) occasions, Plaintiff told Defendant that Plaintiff was not receiving royalties due under the License Agreement. (February 6, 2004, Memorandum ("2/6/04 Mem."), 2; September 13, 2007, Summary of Phone Call ("9/13/07 Summary")). According to Plaintiff, "royalties were due [to Plaintiff] regardless of whether the transaction went through SBS." (2/6/04 Mem., 2).

By June 4, 2003, Defendant began paying Plaintiff SBS Royalty Payments and sending royalty reports. (*Id.* ¶ 145). Defendant sent royalty reports until the License Agreement expired. (*Id.* ¶ 146). The states listed in the royalty reports were only those states that licensed SBS. (*Id.* ¶ 150). The royalty reports never reflected a royalty paid to Plaintiff for rate and form transactions processed by SERFF. (*Id.* ¶ 149).

On one (1) occasion, NIPR reduced the transaction fee for one (1) of its customers, Sircon, by more than 46%. (Defendant's Statement of Facts as to Count III ("DSoF II") ¶¶ 10-12). The transaction rate for a particular transaction was $3.75 and was reduced to $2.00, which was a more than 46% reduction. (*Id.* ¶ 12). Defendant indicated it sent Plaintiff royalty reports listing the transaction rate was $3.19, which was only a 15% reduction, even though NIPR actually charged $2.00. (January 16, 2011, Email Chain ("1/26/11 Email Chain")). Defendant claims it paid Plaintiff as if the transaction fee had only been reduced by 15%, a rate of $3.19 per transaction. (DSoF II ¶ 13).

According to Plaintiff, the royalty reports Defendant sent "indicate on their face that [Defendant] and/or NIPR gave substantial discounts exceeding 15% on tens of thousands of transactions covered by the parties' License Agreement without seeking or receiving [Plaintiff's] consent." (Doc. # 111, pp. 6-7). Plaintiff offers two (2) exhibits that are excerpts from the 2009, 2010, and 2012 royalty reports. (Docs. ## 111-5 ("2009/2010 Excerpt"), 111-6 ("2012 Excerpt"). Both excerpts appear to have the same format, with a designation for the state, the type of transaction, the vendor number, the transaction date, and the transaction fee. (*See* 2009/2010 Excerpt; 2012 Excerpt). In both excerpts, there are varying transaction rates listed for the same transaction. (*Id.*).

For example, in the 2009 and 2010 Excerpt, the transaction fee on non-resident licenses was either $4.27 or $6.18, depending on the Vendor Number. (2009/2010 Excerpt, Bates Nos. AIT_E00224200 – AIT_E00216669). The transaction fee on non-resident licensing renewals in 2009 generally varied from $5.00 or $2.03, depending on the Vendor Number. (*Id*. at Bates Nos. AIT_E00224229 – AIT_E00216680). The fee in 2010 for non-resident licensing renewals generally varied from $5.00 or $3.75, depending on the Vendor Number. (*Id*. at Bates Nos. AIT_E00208982 – AIT_E0213830). In 2012, the fees contained more variation. For non-resident licensing, fees varied from $2.00, $2.71, $3.75, and $6.18. (2012 Excerpt). Fees for non-resident licensing renewals varied from $2.00, $2.71, $3.75, $4.25, and $5.00. (*Id*.). Plaintiff contends the highest fee charged for a transaction was necessarily the "standard fee" for that transaction and that any decrease in price greater than 15% from the standard fee was a breach of the License Agreement. (*See* Doc. # 111, pp. 6-8).

## C. Competition and Other Initiatives

Early on, Defendant contemplated that Plaintiff's LEO could be SBS's competitor. When Defendant was deciding whether to align with Plaintiff to develop SBS, Defendant indicated Plaintiff "could beat [Defendant] to the punch in many states." (PROS/CONS List, 1). Defendant also wrote, "If a partnership is not developed with [Plaintiff], they will become a competitor . . . with delivery of a working system at least eight months prior to [Defendant]." (10/2/01 Mem.). Additionally, Defendant wrote that one (1) of SBS's "Project Goals" was to "[t]ake [Plaintiff] out of the competition with [Defendant] for SBS business." (PowerPoint to Cathy Weatherford). Employees of Defendant testified that a consideration for the decision to align with Plaintiff was to ensure that Plaintiff did not compete in the market against Defendant.

(Deposition of Gary Gummig ("Gummig Depo.") 212:23-213:1; Deposition of Karen Schutter ("Schutter Depo.") 152:18-22).

NIPR also indicated that Plaintiff could be its competitor. In 2001, NIPR indicated that Plaintiff was aggressively marketing LION to states. (December 7, 2001, NIPR Board of Directors Meeting ("12/7/01 NIPR Meeting"), 4). According to NIPR, "[b]ringing in another third party product into the state back-end will only serve to further subdivide the market and make it increasingly difficult to ensure data quality . . . ." (*Id*). NIPR indicated it desired to partner with Defendant in Defendant's SBS venture. (*Id*.). Additionally, NIPR appeared weary of Plaintiff's product because Plaintiff "intend[ed] to sell licensing services independently to the industry such as electronic appointments, terminations, resident and non-resident licensing and renewals . . . without going through the NIPR [G]ateway." (*Id*.). If this occurred, NIPR indicated it would reduce the amount NIPR earned from those transactions. (*Id*.).

Defendant also actively promoted other initiatives, such as Gateway and SERFF. Defendant indicated it "provided strong financial support for both NIPR and SERFF initiatives." (2006 SBS Overview, 15). From 2005 to 2006 Defendant spent over $1 million reengineering SERFF. (Fritz Depo. 433:6-14). Defendant's efforts were greater with regard to Gateway. In 2005, Defendant began "funneling" non-resident licensing transactions exclusively to Gateway as opposed to an SBS front-end system. (3/22/05 Email, 1). By 2007, Defendant required state insurance departments to agree that it must first use Gateway instead of an SBS front-end system if the two (2) offered the same services. (AL Agreement § 6). Defendant also reengineered Gateway in a joint effort with NIPR, where NIPR paid Defendant $11.6 million for its work. (Waggoner Depo. 152:20-153:3, 155:22-157:11). Defendant stated it had ownership in the reengineered Gateway system and was "making a substantial financial and resource commitment

to providing a state-of-the-art technology platform and infrastructure to support the continued growth and support of NIPR's products and services." (January 4, 2008, Memorandum ("1/4/08 Mem."), 1). Defendant also stated its "goal" was "to encourage full utilization by all states of NIPR products and services, including individual and business entity resident and nonresident licensing . . . , as well as realizing the vision of the NIPR Board of a one-stop-shopping." (November 1, 2010, Memorandum ("11/1/10 Mem."), 5).

## II.    LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate if the evidence, viewed in the light most favorable to the [nonmovant] and giving [the nonmovant] the benefit of all reasonable inferences, shows there are no genuine issues of material fact and [the movant] is entitled to judgment as a matter of law." *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011) (citation omitted). "Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact." *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011) (citation omitted). Summary judgment should not be granted if a reasonable jury could find for the nonmoving party. *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.    ANALYSIS[5]

---

[5] The parties agree New York law applies to Plaintiff's breach of contract claims in Counts I, II, and III. (*See* Docs. ## 87, 93, 113, 115, 122, 126). "'Federal courts sitting in diversity apply the choice-of-law rules of the forum state.'" *H&R Block Tax Servs. LLC v. Franklin*, 691 F.3d 941, 943 (8th Cir. 2012) (quoting *Cicle v. Chase Bank USA*, 583 F.3d 549, 553 (8th Cir. 2009)). "'Under Missouri law, a choice-of-law clause in a contract generally is enforceable unless

## A.     Count I

Under Count I, Plaintiff alleges Defendant breached the License Agreement by failing to pay royalties allegedly due.   (Complaint ¶¶ 28-31, 35-40).   According to Plaintiff, the term "SBS" is "extremely broad[]" and encompasses "any[] web-based system proprietary to [Defendant]" and is not limited to LEO-based systems.  (*Id.* ¶ 31).  Instead, Plaintiff contends SERFF and Gateway are web-based systems owned by Defendant and meet the definition of "SBS."  (*See* Doc. # 93, pp. 34-38, 47-49).  Plaintiff claims Defendant "refused to pay [Plaintiff] any portion of the revenue that [Defendant] and/or NIPR generated by processing Transactions using Gateway or other non-LEO systems [such as SERFF]."  (*Id.* ¶ 30; DSoF I ¶¶ 66, 78, 154, 158, 168; *see* Doc. # 93, pp. 47-49).  According to Defendant, SBS should be construed to only mean the web-based system developed from LEO.  (*See* Doc. # 87, p. 48).  Defendant contends Plaintiff is not due royalties on SERFF transactions or non-SBS Gateway transactions (*See id.* at 44-53).

### 1.     *Whether the License Agreement is Ambiguous*

Under New York law, the initial question is "'whether the contract is unambiguous with respect to the question disputed by the parties."  *Law Debenture Trust Co. of N.Y. v. Maverick*

---

application of the agreed-to law is contrary to a fundamental policy of Missouri.'"  *Id.* (quoting *Cicle*, 583 F.3d at 553) (internal quotation marks omitted).  The License Agreement at issue includes a choice-of-law provision stating that New York law shall apply.  (License Agreement § 14).  No party has asserted, and the Court did not discover, § 14 violated any fundamental policies in Missouri.   Thus, the Court applies Missouri substantive law to Plaintiff's breach of contract claims.  Additionally, the parties assume New York law applies to Plaintiff's unfair competition claim.  (*See* Doc. # 87 pp. 83-90; Doc. # 113, pp. 58-60).  Plaintiff's unfair competition claim is a tort action.  Under Missouri's choice-of-law rules, "Missouri courts apply the most-significant-relationship test" to tort claims.  *Wolfley v. Solectron USA, Inc.*, 541 F.3d 819, 823 (8th Cir. 2008) (citation omitted).  New York has the most significant relationship to Plaintiff's tort claim because the parties entered into the License Agreement in New York, which was the mechanism by which Plaintiff claims Defendant prohibited LEO from the market.  Accordingly, the Court will apply New York substantive law to Plaintiff's unfair competition claim.

*Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)) (additional citations omitted). "'Whether a contract is ambiguous is a question of law for the court . . . .'" *Cont'l Holdings, Inc. v. Crown Holdings Inc.*, 672 F.3d 567, 578 (8th Cir. 2012) (quoting *Ferghana Partners, Inc. v. Bioniche Life Scis., Inc.,* 939 N.Y.S.2d 740, at *6 (N.Y. Sup. Ct. 2011)) (additional citation omitted). A contract provision is ambiguous if it is "reasonably susceptible to differing interpretations." *Id*. (quoting *Ferghana*, 939 N.Y.S.2d at *6). A provision does not become ambiguous simply because the parties assign different interpretations to it. *Id*. (quoting *Ferghana*, 939 N.Y.S.2d at *6). When determining if a provision is ambiguous, a court must consider the entirety of the contract. *Id*. (quoting *Brad H. v. City of N.Y.*, 951 N.E.2d 743, 746 (N.Y. 2011).

The parties dispute the meaning of "SBS" within the License Agreement. Despite their differing interpretations, SBS is only reasonably susceptible to one (1) interpretation: SBS is a web-based system owned by Defendant developed using LEO.

At the time the parties entered into the License Agreement, Defendant had not developed SBS but intended to. The License Agreement stated, "[Defendant] desires to develop State-Based Systems ('SBS')." (License Agreement, Recital D). It further iterated that Plaintiff "desired to license" LEO to Defendant "so that LEO shall be used as the basis for the development of SBS." (*Id*. at Recital E). The parties defined SBS as a "web-based system proprietary to [Defendant] providing software, tools, databases, and information to provide participating state insurance departments market conduct, licensing and solvency functions." (*Id*. § 1(j)).

"SBS" was also frequently used in conjunction with "LEO." For example, Plaintiff granted Defendant the "exclusive right to make, use, reproduce, modify, adapt, create derivate

works based on, translate, distribute, transmit, and display LEO within the Insurance Sector solely for the purpose of development, implementation, operation, modification, enhancement and maintenance of SBS ('SBS License')." (*Id*. § 2(a)). Section 2(a) further stated, "[T]he SBS License shall include the right of [Defendant] to use, access, modify, reverse engineer, decompile, and create derivative works based on the LEO source code solely for the purposes set forth above[, i.e., development, implementation, operation, modification, enhancement and maintenance of SBS]." (*Id*.). Plaintiff was to deliver LEO to Defendant because the parties agreed "LEO shall be used as the foundation in the development, implementation, operation, maintenance and enhancement of SBS." (*Id*. §§ 4(a)-(b), (d)).

The parties outlined their ownership rights, demonstrating they understood the difficult nature of the future product once LEO was used in SBS. For instance, the License Agreement stated Defendant owned SBS and Plaintiff owned LEO. (*Id*. §§ 5(a)-(b)). A modification of LEO within SBS would not be deemed property of Defendant and a modification of SBS that used LEO would not be deemed property of Plaintiff. (*Id*.). Additionally, Plaintiff required Defendant to indicate its product used SBS, evincing that SBS meant it was developed using LEO. For instance, Defendant was required to display the "Powered by Aithent" symbol, Plaintiff's trademark, logo, and trade name on SBS and include Plaintiff's "[m]arks on the SBS splash screen and log-in screens." (*Id*. § 8(a)). Defendant was also required to indicate LEO's copyright information in SBS's copyright information "by indicating that a portion of SBS includes copyrighted material of [Plaintiff] on . . . the 'About' display or its equivalent." (*Id*. § 8(d)).

In addition, the parties outlined Defendant's continued use of LEO in the event of Defendant's breach. For example, in the event of Defendant's breach, Defendant "may continue

to use the LEO software licensed under the SBS License only in those States with SBS licenses in effect as of the date of [Plaintiff's] written notice of breach . . . ; however, LEO may not thereafter be sublicensed to any other States." (*Id*. § 7(d)(1)(c)).

When the Court considers the entirety of the License Agreement, "SBS" can only mean a web-based system owned by Defendant to assist insurance departments in their regulatory and licensing functions that was developed using LEO. Because SBS had not yet been created, the parties "desired" to use LEO as its basis. At least three (3) times, Plaintiff obligated Defendant to use LEO as the foundation in the development, implementation, operation, maintenance, and enhancement of SBS. The parties contemplated ownership and copyright and trademark issues once LEO was incorporated into SBS. They also contemplated the continued use of LEO within states that licensed SBS from Defendant in the event of a breach. The License Agreement unambiguously stated that SBS was not just any web-based system owned by Defendant, but it was one (1) developed using LEO. Put another way, SBS does not include Gateway or SERFF because neither were developed using LEO. (*See* DSoF I ¶¶ 46, 76).

Plaintiff's interpretation of "SBS" would have the Court narrow its focus on only § 1(j) without considering other relevant provisions. Considering only § 1(j), the Court might conclude SERFF and Gateway fall within that definition; SERFF and Gateway were owned by Defendant, were web-based, and assisted state insurance departments in their market conduct and licensing functions. However, that understanding of SBS does not comport with the entirety of the document, which the Court is bound to consider. *See Cont'l Holdings*, 672 F.3d at 578 (8th Cir. 2012) (quoting *Ferghana*, 939 N.Y.S.2d at *6).

Plaintiff's interpretation would also render certain language in the License Agreement useless. *See Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007) (citations omitted)

("A reading of the contract should not render any portion meaningless."). For instance, if SBS also meant Gateway and SERFF, both of which already existed at the time the parties entered into the contract, the Recitals indicating that SBS was a web-based system yet to be created would be incongruous. Additionally, since Gateway and SERFF did not use LEO software, the provisions requiring Defendant to use LEO to develop SBS would be rendered meaningless.

Accordingly, the Court finds the term "SBS" within the License Agreement to be unambiguous because it is susceptible to only one (1) meaning: a web-based system owned by Defendant developed using LEO.

### 2. *Interpreting the License Agreement*

Plaintiff alleges Defendant breached the License Agreement when Defendant failed to pay all royalty payments due. (Doc. # 93, pp. 34-37). Specifically, Plaintiff claims it should have been paid for SERFF transactions and transactions using Gateway, regardless of the back-office system used. Defendant contends Plaintiff was not entitled to royalties on SERFF transactions and non-SBS Gateway transactions. (Doc. # 87, pp. 44-53).

"In cases of contract interpretation, it is well settled that when parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms." *S. Road Assocs., LLC v. Int'l Bus. Mach. Corp.*, 826 N.E.2d 806, 809 (N.Y. 2005) (quoting *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004)) (internal punctuation and quotation marks omitted). When interpreting a contract, "the intent of the parties governs." *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990) (citation omitted). A court should give the words and phrases used by the parties their plain meanings. *Whitebox Convertible Arbitrage Partners, L.P. v. IVAX Corp.*, 482 F.3d 1018, 1021 (8th Cir. 2007) (citing *Brooke Grp. v. JCH Syndicate*, 663 N.E.2d 635 (N.Y.

1996)). Additionally, a court must not consider "[e]vidence outside the four corners of the document" to discern "what was really intended." *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) (citations omitted).

Defendant agreed to pay royalties for a limited number of transactions. Defendant agreed to a 50% royalty based on Defendant and NIPR's Net Revenue received for Exhibit A Electronic Transactions. (License Agreement § 6(a)(i)). "Net Revenue" was defined as transaction fees received by Defendant and NIPR, and "Transaction Fee" was defined as an electronic transaction processed "in or through SBS." (*Id*. §§ 1(h), 1(l)). Additionally, the parties defined "Electronic Transaction" as an "electronic interaction within SBS" and cited to Exhibit A. (*Id*. §1(a)). Exhibit A of the License Agreement listed six (6) transactions: resident licenses, resident license renewals, non-resident licenses, non-resident license renewals, appointment renewals, and continuing education. (*Id*. at Exhibit A). As discussed above, "SBS" meant a web-based system owned by Defendant developed using LEO. Accordingly, under the plain language of the License Agreement, Plaintiff was to receive 50% of the net revenue Defendant and NIPR received as transactions fees for six (6) specific electronic transactions — resident licenses, non-resident licenses, resident license renewals, non-resident license renewals, appointment renewals, and continuing education — when those transactions were processed in, through, or within SBS, which only meant Defendant's web-based system developed using LEO.

The parties also agreed that when a State Insurance Department implemented an Electronic Transaction using SBS, royalties were due to Plaintiff from that state's Electronic Transactions for a period of five (5) years. (*Id*. § 6(a)(iii)). The parties defined "State Insurance Department" as a state insurance department that signed an SBS License Agreement. (*Id*. § 1(k)). Accordingly, the parties intended that Plaintiff was to receive royalties from states

processing certain transactions only if that state insurance department had signed an SBS License Agreement. Reading the License Agreement as a whole, royalty payments to Plaintiff were triggered under specific circumstances: (1) the transaction must have been an Exhibit A transaction; (2) the transaction must have been processed in, through, within, or using SBS; and (3) the transaction must have been processed by a State Insurance Department that had signed an SBS License Agreement.[6]

Under this plain language, it is evident the parties did not intend to share revenue from Gateway transactions transmitted to non-SBS systems. While the License Agreement explicitly stated the parties would share in NIPR's revenue, Plaintiff was only required to share in NIPR's revenue generated from transactions processed in, through, or within SBS. (*See id*. §§ 1(h), 1(*l*), 6(a)(i)). Further, the License Agreement does not encompass royalty payments for SERFF rate and form transactions. The License Agreement only recognized royalty payments for the six (6) specific transactions in Exhibit A, and Exhibit A did not include rate and form transactions. (*See id*. at Exhibit A; DSoF I ¶ 77). The License Agreement allowed the parties to add transactions to Exhibit A in writing. (License Agreement § 24, Exhibit A). However, the parties never elected to add rate and form transactions in writing. (DSoF I ¶ 106; Plaintiff's Response to DSoF I ¶ 106). Thus, Plaintiff was not entitled to royalties for SERFF or non-SBS Gateway transactions.

---

[6] Plaintiff argues it is owed royalty payments because Gateway signed license agreements with nearly all state insurance departments, triggering royalty payments on those transactions. (Doc. # 113, p. 35). The License Agreement required State Insurance Departments to sign agreements to license a LEO-based SBS product. Plaintiff has not offered any evidence to suggest any State Insurance Departments signed an agreement to license a LEO-based SBS product. Plaintiff claims three (3) exhibits purport to show that insurance department signed agreements to use Gateway. (*See* Doc. # 113, p. 35; Doc. # 90-1, Exhibits 57, 62; Doc. # 113-9). Two (2) of those exhibits make no mention of license agreements, and one (1) only refers to "MOUs" between Gateway and state insurance departments. Plaintiff has not demonstrated an MOU was an SBS License Agreement. Thus, Plaintiff's argument is unavailing and lacks evidentiary support.

Plaintiff argues Defendant developed an SBS Module for rate and form transactions processed by SERFF; thus it should receive royalties on those transactions. The Record demonstrates Defendant offered an SBS Rate and Form Module that integrated SERFF. (*See* 4/2003 Meeting, Bates No. NAI01236; SBS Rate and Form Flier; 2008 PowerPoint, 6). However, the fact that Defendant offered a Rate and Form Module that integrated SERFF does not support Plaintiff's position. Royalties were due to Plaintiff only when the three (3) triggering events outlined above were met; specifically, Plaintiff only received royalties on transactions if that transaction was listed in Exhibit A. Nowhere in Exhibit A did the parties include rate and form transactions as a royalty-triggering transaction; nor did the parties amend Exhibit A in writing. (*See* License Agreement, Exhibit A; DSoF I ¶¶ 77, 106). Thus, Plaintiff is not entitled to royalty payments on rate and form transactions.

Additionally, Plaintiff argues the parties amended Exhibit A by conduct. (Doc. # 113, pp. 37-38). Plaintiff contends Defendant "paid royalties on transactions that are not listed on Exhibit A (including three at issue here, appointments, terminations and non-resident adjustor licensing, for which [Defendant] paid royalties when the transaction was with a State that had licensed the SBS back office)." (*Id.* at 37). Defendant agreed it paid Plaintiff for those non-Exhibit A transactions that were processed by SBS. (Doc. # 122, p. 24).

"[C]ontracting parties have the discretion to require that all further changes, of any variety, be in writing." *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1273 (N.Y. 1982). New York's "statute of frauds bars oral modifications to a contract which expressly provides that modifications must be in writing." *B. Reitman Blacktop, Inc. v. Missirlian*, 860 N.Y.S.2d 211, 212 (N.Y. App. Div. 2008) (citations omitted). Here, the parties clearly intended to only modify the License Agreement in writing. (License Agreement § 24,

Exhibit A).  However, oral modifications are "enforceable if there is part performance that is 'unequivocally referable to the oral modification,' and a showing of equitable estoppel." *Missirlian*, 860 N.Y.S.2d at 212 (quoting *Rose v. Spa Realty Assocs.*, 366 N.E.2d 1279, 1283 (N.Y. 1977)) (additional citations omitted).  Further, "[m]odifications of written contracts may be proved circumstantially by the conduct of the parties." *Recon Car Corp. of N.Y. v. Chrysler Corp.*, 515 N.Y.S.2d 829, 833 (N.Y. App. Div. 1987) (citations omitted).  The parties' conduct surrounding payment and receipt of payment for appointments, terminations, and non-resident adjustor licenses evinces performance that unequivocally refers to an oral modification of Exhibit A that is enforceable.  That being the case, that does not mean the parties' conduct extends to other kinds of transactions where there is no conduct demonstrating a further oral modification of Exhibit A.  There is no evidence on the Record that Defendant paid Plaintiff royalties for rate and form filings, other non-Exhibit A transactions, or non-SBS Gateway transactions.  Accordingly, the parties' enforceable oral modification to pay Plaintiff royalties on terminations, appointments, and non-resident adjustor licenses processed through SBS does not extend to any other transactions because there was no conduct or part performance unequivocally referring to such an understanding.

Accordingly, because Defendant paid Plaintiff the royalties due under the License Agreement, Plaintiff is not entitled to additional royalties as alleged in Count I.  Therefore, Defendant is entitled to judgment as a matter of law for Count I.

**B.     Count II**

Under Count II, Plaintiff claims Defendant breached the License Agreement when it "impeded the development, production and marketing of . . . SBS" "by choosing to develop Gateway and other [Defendant]/NIPR web based systems to process Transactions" and

"improperly prevented [Plaintiff] from receiving the benefits of the [License] Agreement." (Complaint ¶ 44). Plaintiff argues Defendant breached the common law duty of good faith and fair dealing and the contractual duty to "make reasonable efforts to market SBS." (*Id.*; Doc. # 93, p. 40; License Agreement § 6(a)(vi)).

According to New York law, every contract contains an implied covenant of good faith and fair dealing. *See N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 770 (N.Y. 1995) (citations omitted). Under the implied covenant, neither party may destroy or injure "the right of the other party to receive the fruits of the contract." *Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002)). The implied covenant includes "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995) (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 569 (N.Y. 1978)) (internal quotation marks omitted). However, a contracting party cannot be held to any obligation that would be inconsistent with the express terms of the contract. *Id.* at 292 (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983)). Said another way, "the implied covenant will only aid and further the explicit terms of the agreement . . . ." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1517 (S.D.N.Y. 1989) (citation omitted).

New York law specifically implies a duty of good faith and fair dealing when a party exclusively licenses property to another. *See Havel v. Kelsey-Hayes Co.*, 445 N.Y.S.2d 333, 335 (N.Y. App. Div. 1981) ("The principles thus stated are of particular consequence where the essence of the contract is the grant of a license under which the fate of the subject matter is placed exclusively with the licensee for the purpose of exploitation and profit." (citing *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214 (N.Y. 1917)) (additional citations omitted)). The implied

covenant includes a "promise on [a licensee's] part to use its best efforts to promote the [product]." *Morris v. Putnam Berkley, Inc.*, 687 N.Y.S.2d 139, 140 (N.Y. App. Div. 1999) (citations omitted). "Best efforts," under New York law, is synonymous with "reasonable efforts." *Soroof Trading Dev. Co., v. GE Fuel Cell Sys, LLC*, 842 F. Supp. 2d 502, 511 (S.D.N.Y. 2012) (quoting *Monex Fin. Serv. Ltd. v. Nova Info. Sys., Inc.,* 657 F. Supp. 2d 447, 454 (S.D.N.Y. 2009)). This implied covenant has also been stated to require a licensee "to exploit the subject matter of the license[] with due diligence." *G. Golden Assocs. of Oceanside, Inc. v. Arnold Foods Co.*, 870 F. Supp. 472, 476 (E.D.N.Y. 1994) (citing *Van Valkenburgh, Nooger Neville, Inc. v. Hayden Pub'g Co.*, 281 N.E.2d 142, 144 (N.Y. 1972)) (additional citations omitted). Nonetheless, the implied duty, or even an express duty, to use best efforts to exploit an exclusively licensed product does not require the licensee "to spend itself into bankruptcy to promote" the licensed product. *See Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir. 1979) (citation omitted) (applying New York law and stating the defendant would be "bound to make a good faith effort" to promote the sale of the license product even without a best efforts clause and that a best efforts clause does not require the defendant to "spend itself into bankruptcy").

Further, "New York law does not impose an implied obligation not to market a competing product, so long as [a] defendant[] made reasonable efforts to market [the licensed product]." *New Paradigm Software Corp. v. New Era of Networks, Inc.*, No. 99CIV.12409RMBAJP, 2002 WL 31749396, at *14 (S.D.N.Y. Dec. 9, 2002) (citing *Valkenburgh*, 281 N.E.2d 142). Even an express clause to use best efforts would not require a licensee to refrain from promoting a competing product. *Id.* (citing *Valkenburgh*, 281 N.E.2d 142). Absent an express contractual provision not to compete, exclusive licensees "are not

deemed to limit themselves in their usual business enterprise to the promotion of the licensor's product."[7] *Valkenburgh*, 281 N.E.2d at 145. A licensee's competition may incidentally lessen the licensor's royalties, but this is not a breach *per se*. *See id.* (stating competition is permitted despite an obligation to use best efforts so long as the competition is not too detrimental). Nonetheless, "there may be a point where [a licensee's competition] is so manifestly harmful to the [licensor] . . . as to justify the court in saying there was a breach of the covenant to promote the [licensor's] work." *Id.* The issue is not that a licensee competes but whether the licensee used reasonable efforts to market the licensor's product despite engaging in competition. *New Paradigm*, 2002 WL 31749396, at *15.

Under the implied covenant and § 6(a)(vi) of the License Agreement, Defendant had a duty to exploit and use best efforts to promote and market SBS. Plaintiff claims Defendant breached its duty in two (2) ways. First, Plaintiff claims Defendant breached the License Agreement when it "shelved" the SBS front-end system in favor of Gateway. (Doc. # 93, pp. 38-43). Second, Plaintiff claims Defendant breached the License Agreement when it failed to promoted the SBS back-office system. (*Id.* at 44-49). Defendant contends it is entitled to summary judgment because New York law does not prohibit it from developing other initiatives and Plaintiff has offered insufficient evidence that Defendant did not use reasonable efforts to promote SBS. (Doc. # 87, pp. 68-79).

### 1. Whether Defendant Breached its Duty When It Allegedly "Shelved" the SBS Front-End System

According to Plaintiff, Defendant promoted and developed Gateway instead of the SBS front-end system. Plaintiff claims Defendant used its exclusive license to "suppress LEO so that

---

[7] Plaintiff does not argue the License Agreement expressly prohibited Defendant from competing with SBS.

[Gateway] could obtain for itself . . . the lucrative front end business that [Defendant] had promised to pursue for SBS." (Doc. # 93, p. 42). Implicit in Plaintiff's claim is that the parties agreed to develop SBS as a front-end system similar to Gateway. The Court must interpret the License Agreement to determine whether the parties intended to develop SBS as a front-end system similar to Gateway.

When interpreting the License Agreement, it should be enforced according to its terms, and "the intent of the parties governs." *See Road Assocs.*, 826 N.E.2d at 809 (quoting *538 Madison Realty*, 807 N.E.2d at 879); *Am. Express Bank*, 562 N.Y.S.2d at 614 (citation omitted). The Court gives the words and phrases used by the parties their plain meanings and will not consider "[e]vidence outside the four corners of the document" to discern "what was really intended." *See Whitebox*, 482 F.3d at 1021 (citing *Brooke Grp.*, 663 N.E.2d 635); *Giancontieri*, 566 N.E.2d at 642 (citations omitted).

Every back-office system must have a front-end system. (*See* DSoF I ¶¶ 17, 50). The parties agree that a front-end system interfaces with producers and companies to send information to a back-office system, while a back-office system is a system used by state insurance departments to compile that information to ensure compliance with its state laws. (*See id.*). Reading the License Agreement as a whole, the parties intended that Defendant use LEO to create SBS as a back-office system and it did not obligate Defendant to use LEO to develop SBS as a front-end system that operated like Gateway. In particular, the License Agreement described SBS as a product for state insurance departments to use, as opposed to a front-end system for producers to use.

Twice in the License Agreement the parties defined "SBS" as "a web-based system proprietary to [Defendant] providing software, tools, databases, and information to facilitate state

insurance departments in their market conduct, licensing and solvency functions." (License Agreement § 1(j), Recital D). Thus, Defendant must reasonably exploit SBS so that it would facilitate state insurance departments' several functions.

The License Agreement often referenced SBS in conjunction with state insurance departments. For example, royalties were due to Plaintiff if a state insurance department processed an Exhibit A Electronic Transaction using SBS and that state insurance department signed an SBS License Agreement. (*Id*. §§ 1(k), 6(a)(i), 6(a)(iii)). The License Agreement also provided that Defendant must pay Plaintiff royalties for a five-year period when a state insurance department, which signed an SBS License Agreement, implemented an Electronic Transaction. (*Id*. § 6(a)(iii)). An "Electronic Transaction" was an electronic interaction between producers and state insurance departments within SBS. (*See id*. § 1(a)). Additionally, Defendant was to send "a detailed statement . . . itemizing the number of Electronic Transactions by State Insurance Department . . . ." (*Id*. § 6(a)(iv)). Further, if Defendant breached, Defendant could continue to use LEO in SBS in states that signed SBS License Agreements. (*Id*. § 7(d)(1)(b)-(c)). Thus, the parties intended SBS to be a system that assisted state insurance departments and Defendant was to pay Plaintiff royalties when SBS facilitated certain transactions for state insurance departments. The language of the License Agreement does not suggest the parties intended to develop SBS as a system to assist producers or companies, like Gateway.

Accordingly, Defendant was only obligated to reasonably market and exploit SBS as a back-office system under § 6(a)(vi) and the implied covenant. Defendant was not required to reasonably market or exploit SBS as a front-end system similar to Gateway because that would be inconsistent with the express terms of the contract. *See Dalton*, 663 N.E.2d at 292 (quoting

*Murphy*, 448 N.E.2d 86).   Therefore, Defendant did not breach the License Agreement, as a matter of law, for "shelving" the SBS front-end system in favor of Gateway.

### 2. *Whether Defendant Breached its Duty Regarding the SBS Back-Office System*

Plaintiff claims Defendant breached its duty to develop and promote the SBS back-office system when Defendant:  (1) "spent practically no money marketing SBS," (2) chose not to enhance SBS because it would have to continue to share revenue with Plaintiff, (3) "loaded SBS with non-revenue-generating transactions while, at the same time, it developed revenue-generating transactions . . . outside of SBS," and (4) "enter[ed] into contracts that were manifestly harmful to SBS."  (Doc. # 93, pp. 44-46).   Defendant contends it used reasonable efforts under the circumstances and that Plaintiff has not offered any genuine issue of material fact to suggest otherwise.  (Doc. # 87, pp. 77-79).

### a. *Plaintiff's Claim that Defendant Spent No Money on SBS*

First, Plaintiff contends Defendant spent practically no money on marketing SBS.  (Doc. # 93, p. 44).  Plaintiff places great emphasis on the fact that Defendant spent less than $9000 on marketing SBS between 2002 and 2004 while its gross revenue during those years was approximately $171 million.  (2002-2009 Summary, 3-5; 2002 NAIC Annual Report, Bates No. NAI_E000227; 2003 NAIC Annual Report, Bates No. NAI_E000266; 2004 NAIC Annual Report Bates No. NAI_E000216).  Whether the decision to spend that amount was reasonable or in good faith must be considered under the circumstances.  *See Hasbro, Inc. v. Child's Play Int'l Corp.*, No. 87 Civ. 4613 (WK), 1991 WL 156282, at *6 (S.D.N.Y. Aug. 2, 1991) (citation omitted) ("Indeed, whether or not a licensee's efforts were adequate necessarily depends on the particular circumstances in which such efforts were undertaken.").

Early on, there were factors that contributed to the slower development and popularity of SBS, including (1) Defendant charging an implementation fee to state insurance departments; (2) Defendant offering a limited number of Modules; (3) Defendant paying over $635,000 in consulting fees to Plaintiff within the first eight (8) months to make SBS functional; (4) state insurance departments facing budget cuts; and (5) Defendant competing with Sircon, which offered its system for no upfront implementation fee. (DE Agreement § 5, Exhibit A; NJ Agreement § 5, Exhibit A; RI Agreement § 5, Exhibit A; 4/3/2003 Letter, 1; 12/15/2004 Email; 2006 SBS Overview, 11). Between 2002 to 2006, Defendant only licensed SBS to six (6) states. (DSoF I ¶ 125; 2010 SBS Overview, Bates Nos. NAI_E478791 – NAI_E478792).

However, Defendant took certain steps that increased the number of state insurance departments that licensed SBS. From 2005 to 2009, Defendant spent increasingly more money on marketing SBS: $30,017.56 in 2005; $51,101 in 2006; $56,136 in 2007; $59,389.44 in 2008; and $61,036.94 in 2009. (2002-2009 Summary, 6-10).

Also, Defendant changed its policy on charging state insurance departments implementation fees. Early on, Defendant could offer SBS for an implementation fee because it was unique in the market with little competition. (2006 SBS Overview, 11). However, by 2006, Sircon began offering a similar back-office system but for free. (*Id*.). Defendant also recognized that its other initiatives, like SERFF, faired better once upfront fees were removed. (*Id*. at 15). Accordingly, in 2007, Defendant offered SBS to state insurance departments for no upfront cost. (*See* AL Agreement § 5).

Additionally, Defendant recognized by late 2004 that SBS needed to be developed into a more "robust" system to include other regulatory modules to meet the desires of state insurance departments. (12/15/2004 Email). To do this, Defendant indicated it needed to reduce the

amount of consulting fees Defendant paid to Plaintiff. (*Id.*). In 2005, Defendant eliminated costly upfront consulting fees to Plaintiff and would not pay consulting fees until it licensed SBS to more states. (*Id.*). To make SBS more "robust, Defendant added many more Modules between 2006 and 2011. (*See* 2006 SBS Overview, 5; AL Agreement, Exhibit A; 2008 PowerPoint, 5-6; 2010 SBS Overview, Bates Nos. NAI_E478804 – NAI_E478805).

Further, Defendant attempted to better position SBS in the market by offering lower transaction fees. (3/22/05 Email). In 2005, Defendant lowered transaction fees when transactions were processed from Gateway to an SBS back-office system and requested that Plaintiff allow Defendant to lower transaction fees when a transaction was processed from SBS front-end to SBS back-office as well. (*Id.* at 1-2). In 2007, transaction fees for both SBS front-end and Gateway were lowered. (AL Agreement, Exhibit G).

After Defendant implemented these changes, the number of states licensing SBS increased each year. Defendant licensed SBS to six (6) states in 2007, four (4) states in 2008, four (4) more in 2009, and two (2) more in 2010. (2010 SBS Overview, Bates Nos. NAI_E478793 – NAI_E478796). Currently, twenty-five (25) states have licensed SBS, while Sircon has only licensed to twenty-two (22) states. (DSoF I ¶¶ 33, 137).

Even though the Record demonstrates Defendant made efforts in the later years of the License Agreement to market SBS, Plaintiff has presented evidence demonstrating a material issue of fact exists as to whether Defendant used reasonable efforts to market SBS under the circumstances. In particular, a reasonable juror might find that the amount of money spent in light of Defendant's gross revenue was not sufficient and therefore unreasonable. Accordingly, Defendant is not entitled to judgment as a matter of law.

> **b.** **Plaintiff's Claim that Defendant Chose Not to Enhance SBS Due to Royalty Payments to Plaintiff**

Plaintiff contends Defendant chose not to enhance SBS because it would have to continue to pay royalties to Plaintiff and that such a decision is in violation of New York law to use best efforts. (Doc. # 93, p. 44). Plaintiff cites to a 2008 PowerPoint. In that PowerPoint, Defendant listed five (5) options to make SBS more competitive in the market. (2008 PowerPoint, 8). Defendant listed the options' advantages and disadvantages as well as weighing the options on a number scale — the lower the number on a scale of one (1) to five (5) was better. (*Id*. at 10, 12, 14, 16, 18, 20). When considering all options to improve SBS, Defendant considered the upfront costs, ongoing costs to support the improved SBS, the long-term revenue for Defendant, the ability to control the improved SBS, ease of use of the improved SBS, and legal, execution, and political risks. (*Id*. at 20). Defendant listed royalty-sharing with Plaintiff as a disadvantage to four (4) of the options. (*Id*. at 10, 12, 14, 18). Three (3) options scaled three (3) out of five (5); one (1) option scaled 2.6; another option scaled 3.4. (*Id*. at 20). The lowest scaled number, thus the best option, included royalty payments to Plaintiff as a disadvantage. (*Id*.)

Plaintiff's argument fails for several reasons. First, Plaintiff does not assert that considering royalty payments as a factor was necessarily unreasonable. Certainly, were that Defendant's only consideration, the Court might conclude that to be unreasonable. However, that is not the case here because Defendant considered a host of factors when weighing its options. Second, there is no indication that paying royalties to Plaintiff was given any greater weight than any other advantage or disadvantage. The best scaled option included royalty payments as a disadvantage. Finally, Plaintiff has not demonstrated that Defendant chose to not enhance SBS because it had to make royalty payments to Plaintiff. In fact, Defendant continued to add Modules to SBS despite the ongoing royalty obligation to Plaintiff. (*See* 2006 SBS Overview, 5; AL Agreement, Exhibit A; 2008 PowerPoint, 5-6; 2010 SBS Overview, Bates Nos.

NAI_E478804 – NAI_E478805).  Accordingly, Plaintiff's argument is not supported by the Record and it has not demonstrated Defendant breached the License Agreement for this reason.

### c. Plaintiff's Claim that Defendant Only Developed Non-Revenue-Generating Modules

According to Plaintiff, Defendant only developed non-revenue-generating Modules while developing non-SBS revenue-generating initiatives.  (Doc. # 93, p. 44).  Plaintiff contends Defendant was required to spend money to develop revenue-generating Modules for SBS, as opposed to non-revenue-generating Modules, because Defendant had a duty to maximize royalties for Plaintiff.  (Doc. # 93, p. 46; Doc. # 136, pp. 75-77).

As an initial matter, Defendant did not have a duty to maximize Plaintiff's profits. As explained above, Defendant was obligated to put forth reasonable efforts under both the implied covenant and § 6(a)(vi) of the License Agreement.  Neither the License Agreement nor the implied covenant required Defendant to maximize the profits for Plaintiff.  *See G. Golden*, 870 F. Supp. at 476 (citing *Valkenburgh*, 281 N.E.2d at 144) (additional citations omitted) (stating a party was required to use reasonable efforts) to exploit); *Morris*, 678 N.Y.S.2d at 140 (citations omitted) (same).  Additionally, the duty to use best efforts does not guarantee success in the venture.  *Soroof*, 842 F. Supp. 2d at 511 (citation omitted); *see also Hasbro*, 1991 WL 156282, at *5-7 (concluding a defendant used reasonable efforts to market a product even though the product was not very successful).  Thus, Defendant was not obligated to maximize profits for Plaintiff or guarantee SBS's success.

Further, Defendant's duty to reasonably market and develop SBS was not limited only to developing revenue-generating Modules.  The License Agreement required Defendant to market SBS, without limiting the kind of SBS Modules that might be developed or how Defendant would market or develop SBS.  (*See* License Agreement § 6(a)(vi)).  Instead, Defendant was

obligated to reasonably market SBS as a whole. However, there are issues of fact as to whether Defendant had the resources or ability to add revenue-generating Modules to SBS. If Defendant was capable but failed to do so in bad faith, a reasonable jury could find Defendant failed to reasonably market and exploit SBS.

Plaintiff contends that since Defendant promoted Gateway and SERFF, which did generate revenue for Defendant, that Defendant did not reasonably market SBS or do so in good faith. (Doc. # 126, p. 77). Defendant spent over $1 million reengineering SERFF from 2005 to 2006 and spent $11.6 million reengineering Gateway from 2007 to 2010. (Fritz Depo. 433:6-14; Waggoner Depo. 152:20-153:3, 155:22-157:11). Defendant spent similar if not greater amounts on SBS; it spent over $15 million on SBS from 2002 to 2009 while having a net loss of over $10 million. (2002-2009 Summary, 2). Despite the amount of money spent on SERFF and Gateway, Defendant continued to add Modules to SBS from 2006 to 2011. (*See* 2006 SBS Overview, 5; AL Agreement, Exhibit A; 2008 PowerPoint, 5-6; 2010 SBS Overview, Bates Nos. NAI_E478804 – NAI_E478805).

There are facts demonstrating Defendant promotion of SERFF and Gateway were not antithetical to promoting SBS. SERFF was eventually integrated into an SBS Rate and Form Module, which may have made it more robust and attractive to state insurance departments. (*See* 2006 SBS Overview, 5). In addition, SBS processed transactions from Gateway and the SBS front-end system and Plaintiff received royalties from either front-end system. (DSoF I ¶¶ 34-35, 51-52, 61-64, 135). Thus, promoting Gateway and SERFF did not necessarily undermine the development, marketing, or enhancements of SBS or detract from royalty payments to Plaintiff.

Nonetheless, a reasonable jury could find that Defendant's promotion of other initiatives was so manifestly harmful to SBS that it amounted to a breach of the duty to reasonably market

and exploit SBS as a back-office system.  *Valkenburgh*, 281 N.E.2d at 145.  Accordingly, Defendant is not entitled to judgment as a matter of law.

### d. *Plaintiff's Claim that Defendant Entered into Contracts that were Harmful to SBS*

Plaintiff contends Defendant entered into contracts that were harmful to SBS in two (2) ways:  (1) when it "executed an agreement with NIPR to replace the SBS front end with the NIPR front end, an act that was self evidently damaging to SBS[ because] not only would SBS lose its only revenue generating component, but the component of SBS that remained, *i.e.*, its back office, would be far less attractive to state regulators without its corresponding external functionality;" and (2) when it "entered into [contracts] with the states that licensed SBS . . . [because Defendant] inserted a standard clause into those contracts which required the state to use NIPR products, rather than SBS products."  (Doc. # 93, p. 45).

A reasonable juror might determine Defendant's contract with NIPR, or requiring states to use Gateway, was harmful to SBS because they made SBS "less attractive."  Plaintiff cites to a 2008 PowerPoint as evidence for its claim.  In that PowerPoint, Defendant asserted that "[a] key selling point of the Sircon application is the level of support that they provide for the states and producers[, and Sircon] do[es] not depend on a 'third party (ie, NIPR)' to provide any support." (2008 PowerPoint, 7).  By April 2008, SBS was licensed only to eight (8) states and Sircon was licensed to 50% more states than SBS.  (*Id*. at 3).  The evidence also demonstrates SBS was more successful than Sircon, despite this dependence on Gateway.  For example, in that same PowerPoint, Defendant indicated that despite SBS's dependence on Gateway, during the past year, Defendant "had more success adding states than Sircon."  (*Id*.).  Today, Defendant has licensed SBS to twenty-five (25) states while Sircon is only licensed to twenty-two (22) states. (DSoF I ¶ 137).  Despite some success in the market, whether SBS could have been more

marketable without dependence on Gateway and NIPR is a material issue of fact for trial. Thus, Defendant is not entitled to summary judgment.

### 3. *Statute of Limitations*

Defendant argues Plaintiff's claim is barred by the statute of limitations. (Doc. # 87, p. 63). "'A federal court exercising diversity jurisdiction is required to apply the law of the forum when ruling on statutes of limitations.'" *Pinnacle Pizza Co. v. Little Caesar Enters., Inc.*, 598 F.3d 970, 975 (8th Cir. 2010) (quoting *Nettles v. Am. Tel. & Tel. Co.,* 55 F.3d 1358, 1362 (8th Cir.1995)). "'Missouri, the forum, considers statutes of limitations issues procedural, and, therefore, governed by Missouri law.'" *Nettles*, 55 F.3d at 1362 (quoting *Renfroe v. Eli Lilly & Co.*, 686 F.2d 642, 646 (8th Cir. 1982)). Under Missouri law, "[c]ivil actions . . . can only be commenced . . . after the cause[] of action shall have accrued." Mo. Rev. Stat. § 516.100. An action accrues not "when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment." *Id.* It is for the Court to determine when and where a cause of action accrued. *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 992 (8th Cir. 2007) (citing Mo. Rev. Stat. § 561.100; *Ferrellgas, Inc. v. Edward A. Smith, P.C.*, 190 S.W.3d 615, 623 (Mo. Ct. App. 2006)).

In some circumstances, Missouri law "borrows" the statute of limitations of other jurisdictions. *See* Mo. Rev. Stat. § 516.190. Under Missouri law, "[w]henever a cause of action has been fully barred by the laws of the state . . . in which it originated, said bar shall be a complete defense to any action thereon." *Id.* The term "originated" means "accrued." *Great Plains Trust*, 492 F.3d at 992 (citing *Thompson v. Crawford*, 833 S.W.2d 868, 871 (Mo. 1992)). "Specifically in a breach-of-contract suit, the cause of action 'accrues upon a defendant's failure

to do the thing at the time and in the manner contracted.'" *Great Plains Trust*, 492 F.3d at 992 (quoting *Davis v. Laclede Gas Co.*, 603 S.W.2d 554, 555 (Mo. 1980)).

The parties contend the essence of Plaintiff's breach of contract claim in Count II is a claim for failure to pay money. (Doc. # 87, p. 64; Doc. # 181, p.1). When the essence of claim is failure to pay, the cause of action accrues at the place payment was due. *Master Mortg. Inv. Fund, Inc. v. Am. Nat'l Fire Ins. Co. (In re master Mortg. Inv. Fund, Inc.)*, 151 B.R. 513, 517 (W.D. Mo. 1993). According to the parties, New York's statute of limitations applies because that is where payment was due. The Court disagrees. The essence of Plaintiff's claim in Count II is that Defendant failed to reasonably market SBS. Missouri law applies because Defendant allegedly failed to reasonably market SBS in Missouri because that is its place of incorporation. Accordingly, Missouri's five-year statute of limitations applies. *See Aerotronics, Inc. v. Pheumo Abex Corp.*, 62 F.3d 1053, 1067-68 (8th Cir. 1995) (discussing Missouri cases and stating the ten-year statute of limitations applies to enforcement of contract provisions for payment of money and the five-year statute of limitations applies to all other breaches in contract obligations); *John v. State Mut. Life Assurance Co. of Am.*, 942 F.2d 1260, 1266 (8th Cir. 1991) (providing that a plaintiff's claim enforcing a defendant's written promise for payment of money was governed by Missouri's ten-year statute of limitations and not the five-year statute of limitations); *cf. Hughes v. Dev. Co. V. Omega Realty Co.*, 951 S.W.2d 615, 617 (Mo 1997) ("[T]he ten-year statute of limitations applies to every breach of contract action in which the plaintiff seeks a judgment from the defendant for payment of money the defendant agreed to pay in a written contract." (citing § 516.110(1)).

Plaintiff filed its Complaint on February 14, 2011. As a matter of law, any claim for damages based on Defendant's failure to reasonably market SBS prior to February 14, 2006, is barred by the statute of limitations.

## C.     Count III

In Count III, Plaintiff alleges Defendant breached the License Agreement when it lowered the transaction fees by more than 15% in a calendar year without obtaining Plaintiff's consent. (Complaint ¶¶ 49-50). Under § 6(a)(v) of the License Agreement, Defendant and NIPR had discretion to establish, increase, and decrease Transaction Fees for SBS. Defendant, however, could not reduce the price of a Transaction Fee for transactions listed in Exhibit A by more than 15% during any calendar year unless the parties agreed. (License Agreement § 6(a)(v)). A "Transaction Fee" was defined as a fee charged for each Electronic Transaction in or through SBS. (*Id*. § 1(*l*)). An "Electronic Transaction" meant an "electronic interaction within SBS" and defined by Exhibit A. (*Id*. § 1(a)). Reading § 6(a)(v) with the relevant definitions together, Defendant was prohibited from reducing the fees for Exhibit A Electronic Transactions processed in, through, or within SBS during a calendar year by more than 15%.

According to Plaintiff in its Motion, Defendant breached the License Agreement when NIPR "lowered transaction fees for Sircon, the company whose product is the principal competitor for the SBS back office, by 46% in 2011." (Doc. # 93, pp. 51-52). Plaintiff's claim is not warranted under the License Agreement. Defendant and NIPR were permitted to reduce transaction fees by any percent when those transactions were not processed in, through, or within SBS. Sircon is a different back-office system that uses Gateway to transmit producer licensing transactions. (*See* DSoF I ¶ 51). The License Agreement does not prohibit NIPR or Defendant from lowering transaction rates for Sircon or other systems that are not an SBS system.

45

Therefore, Defendant did not breach the License Agreement when NIPR lowered transaction fees for Sircon by 46% in 2011.

Additionally, Plaintiff, in its brief in opposition to Defendant' Motion on Count III, stated "[Plaintiff] intends to show . . . there were, in fact, tens of thousands, if not millions, of additional breaches from 2005 through 2012." (Doc. # 111, p. 12). Plaintiff offers excerpts from the 2009, 2010, and 2012 royalty reports. All excerpts are in the same format and all have varying transaction rates listed for the same transaction. Plaintiff claims that the highest fee charged for a particular transaction in those excerpts was the "standard fee" for that transaction and that any deviation from that fee greater than 15% was a breach. For example, in 2009 and 2010, the transaction fee charged for non-resident licenses was either $4.27 or $6.18 but the variation depended upon the vendor number. (2009/2010 Excerpt, Bates Nos. AIT_E00224200-AIT_E00216669). Notwithstanding Plaintiff's allegations, there is no indication in any of the excerpts or in the License Agreement what the "standard fee" was for any transaction.

One (1) plausible interpretation for the variation in fees is that some transaction fees were raised from the "standard fee" depending on the vendor; for example, the "standard fee" was $4.27 but was increased to $6.18. Another explanation for the variation is that some were processed using Gateway and some using an SBS front-end system. There are facts on the Record that the different front-end systems charged different rates. For example, in 2005, the SBS front-end system charged $10 per non-resident license transaction while Gateway charged $8.55 for transmissions to SBS systems. (3/22/05 Email, 1). In 2007, the SBS front-end system charged $5 per non-resident and resident license transactions while Gateway charged $7.10 per non-resident license transaction and $5 per resident license transaction for transmission to SBS back-office systems. (AL Agreement, Exhibit G). Nonetheless, it is unclear from the excerpts

46

why there was a variation in prices. At best, there are genuine issues of material fact as to whether Defendant reduced the Transaction Fees for Exhibit A Electronic Transactions processed using SBS by more than 15% during a calendar year without Plaintiff's consent.

The parties also dispute the measure of damages in the event of a potential breach. According to Defendant, because it had the discretion to lower transaction fees by 15% without Plaintiff's consent, "[Plaintiff] is only entitled to recover what it would have received had the reduction in the transaction fee been 15%." (Doc. # 121, p. 15). Plaintiff contends it is "entitled to recover the difference between the amount [Defendant] actually paid in royalties to [Plaintiff] and the amount it would have paid [Plaintiff] if there had been no discount . . . by more than 15%." (Doc. # 111, p. 11).

"Although the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) (citation and internal quotation marks omitted); *accord Credit Suisse First Boston v. Utrecht-America Fin. Co.*, 923 N.Y.S.2d 482, 483 (N.Y. App. Div. 2011) (citations omitted). "Damages are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed." *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*, 692 N.E.2d 551, 553 (N.Y. 1998) (citations omitted). The License Agreement allowed Defendant to reduce the price of a transaction fees at its discretion but not more than 15% without Plaintiff's consent. (License Agreement § 6(a)(v)). Thus, if Defendant reduced the price of a transaction fee for an Exhibit A Electronic Transaction by more than 15%, Plaintiff is entitled to damages it would have received had Defendant only reduced the price by just 15%, as Defendant was entitled to do under the License Agreement.

Defendant contends that even if it did reduce fees by more than 15%, it paid Plaintiff as if it had only reduced fees by 15%. (Doc. # 121, p. 15). Thus, Defendant claims Plaintiff is not damaged. However, under New York law, if Plaintiff can demonstrate Defendant breached the License Agreement, Plaintiff may sue for nominal damages even if actual damages cannot be demonstrated. *See Ross v. Sherman*, 944 N.Y.S.2d 620, 621 (N.Y. App. Div. 2012) (citations omitted).

Accordingly, Defendant is entitled to judgment as a matter of law as to Count III regarding NIPR's 46% reduction for Sircon. However, fact questions exist as to Count III regarding other potential greater-than-15% reductions.

**D.   Count V**

In Count V, Plaintiff alleges Defendant engaged in unfair competition "by using its exclusive license to suppress a competitor [specifically, LEO], and by using [Plaintiff's] confidential information to develop a product which competes with LEO." (Complaint ¶¶ 57-64). Plaintiff contends Defendant violated New York's common law against engaging in unfair competition when Defendant: (1) misappropriated its LEO-based confidential information to develop Gateway; and (2) "used its exclusive license to prevent [Plaintiff] from marketing LEO so that Gateway and other [Defendant]/NIPR based systems, once fully developed, could draw revenues away from the LEO-based SBS." (DSoF I ¶¶ 192-193; Complaint ¶¶ 60-61).[8]

---

[8] Defendant claims that if the Court grants it summary judgment on Count I, Plaintiff is precluded from succeeding on Count V because Plaintiff is asking for the same damages in both counts. (Doc. # 87, pp. 84-85). However, Plaintiff's claims under Counts I and V are premised on different theories of liability: contract and tort. Thus, favorable summary judgment for Defendant on Count I does not preclude summary judgment for Plaintiff on Count V. Defendant also contends that Plaintiff's claims in Count II and V are the same. (Doc. # 87, p. 85). The Court does not agree. As stated above, Plaintiff's claim under Count II is for breach of contract while Count V is a tort claim. Further, Plaintiff alleges different facts to establish its claim under

### 1. *Misappropriation of LEO for Use in Gateway*

The parties agree that Gateway was not developed using Plaintiff's LEO.  (DSoF I ¶ 46).

Accordingly, there is no genuine issue of material fact and Defendant is entitled to judgment as a

matter of law.

### 2. *Suppressing Competition*

New York recognizes two (2) theories of common law unfair competition:  (1) palming

off and (2) misappropriation.  *ITC Ltd. v. Punchgini, Inc.*, 880 N.E.2d 852, 858 (N.Y. 2007)

(citation omitted).  "Palming off" is "the sale of the goods of one manufacturer as those of

another."  *Id*.  A claim for misappropriation "usually concerns the taking and use of the

plaintiff's property to compete against the plaintiff's own use of the same property."  *Id*. at 859

(quoting *Roy Export Co. Est. of Vaduz, Liecht. v. Colum. Broad. Sys., Inc.*, 672 F.2d 1095, 1105

(2d Cir. 1982)).  New York's common law unfair competition doctrine is "'broad and flexible,'"

encompassing an "'incalculable variety' of illegal practices" or "'commercial immorality.'"  *Roy

Export*, 672 F.2d at 1105 (quoting *Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co.*, 159

N.Y.S.2d 606, 609 (N.Y. App. Div. 1957); *Metro. Opera Ass'n v. Wagner-Nichols Recorder

Corp.*, 101 N.Y.S.2d 483, 488-89, 492 (N.Y. Sup. Ct. 1950)).  It includes the "'misappropriating

for the commercial advantage of one person'" and the "taking [of] 'the skill, expenditures and

labors of a competitor.'"  *Id*. (quoting *Electrolux Corp. v. Val-Worth, Inc.*, 161 N.E.2d 197, 203

(N.Y. 1959); *Metro. Opera*, 101 N.Y.S.2d at 489).  The tort is "adaptable and capacious."  *Id*.

Defendant argues summary judgment is appropriate for three (3) reasons:  (1) Plaintiff

cannot say Defendant unfairly competed with SBS because Plaintiff also competed with SBS; (2)

New York law does not recognize an unfair competition claim under the present facts; and (3)

---

Count II than it does under Count V.  (*See* Complaint ¶¶ 41-46, 57-64). Thus, Defendant's
argument is without merit.

Defendant cannot be said to have unfairly competed with SBS because Gateway is owned by NIPR, not Defendant. (Doc. # 87, pp. 87-89). Defendant's first reason is premised on the theory that its own conduct or competition could not be tortious if Plaintiff was permitted to compete, as well. Plaintiff's conduct is not at issue, however; Defendant's conduct is. Even assuming Plaintiff engaged in competition with SBS, that does not mean Defendant's alleged competition with SBS was fair or proper under New York law. Therefore, the Court finds Defendant's first argument to be meritless.

Defendant's second argument is a too-restrictive reading of New York's law on unfair competition. The essence of Plaintiff's claim surrounds Defendant's attempt to remove Plaintiff and its product, LEO, from the market by entering into an exclusive license, so that Gateway could monopolize the market without competition from LEO. Essentially, Plaintiff claims Defendant "'misappropriat[ed] . . . the commercial advantage of [Plaintiff's]" and "[took] 'the skill, expenditures and labors of [Plaintiff],'" which is recognized as actionable conduct under New York's common law unfair competition doctrine. *See Roy Export*, 672 F.2d at 1105 (quoting *Electrolux*, 161 N.E.2d at 203; *Metro. Opera*, 101 N.Y.S.2d at 489). Thus, Defendant's second argument is unavailing.

Finally, Defendant argues that it cannot be liable for unfair competition because NIPR's conduct regarding Gateway cannot be imputed to Defendant. There is an issue of fact as to the degree of interest that Defendant had in Gateway and NIPR. For example, Defendant had contracts with NIPR for royalties for Gateway and allegedly owned 50% of Gateway. Thus, Defendant, with an alleged interest in both NIPR and Gateway, may have unfairly competed when it allegedly removed LEO as competition with Gateway.

Additionally, Plaintiff introduced facts to show that Defendant was motivated, at least in part, to enter into a license agreement with Plaintiff because of the potential competition between LEO, SBS, and Gateway. (PROS/CONS List, 1; 10/2/01 Mem.; Gummig Depo. 212:23-213:1; Schutter Depo. 152:18-22; 2/7/01 NIPR Meeting, 4). A reasonable jury could find Defendant engaged in unfair competition. Defendant, therefore, is not entitled to summary judgment on Count V.

### 3.    *Statute of Limitations*

Defendant also argues Plaintiff's claim is barred by the statute of limitations. Under Missouri's borrowing statute, "[w]henever a cause of action has been fully barred by the laws of the state . . . in which it originated, said bar shall be a complete defense to any action thereon." Mo. Rev. Stat. § 516.190. The term "originated" means "accrued." *Great Plains Trust*, 492 F.3d at 992 (citing *Thompson v. Crawford*, 833 S.W.2d 868, 871 (Mo. 1992)). Plaintiff's cause of action accrued in New York because that is the place it developed LEO and the place where LEO was allegedly suppressed from competing in the market.

Under New York law, Plaintiff's tort for unfair competition is governed by either the six-year or the three-year statute of limitations. *See Greenlight Capital, Inc. v. Greenlight (Switzerland) S.A.*, No. 04 Civ. 3136(HB), 2005 WL 13682, at *7 (S.D.N.Y. Jan. 3 2005) (citing cases). The three-year statute of limitations applies to misappropriation claims, claims for damage to property, and statute-based claims. *Id*. (citations omitted). If a defendant's conduct was based on fraud, breach of contract, or passing off, the statute of limitations is six (6) years. *See id*. (citations omitted) (stating that the statute of limitations was six (6) years for fraud-based or breach of contract claims); *see also Kwan v. Schlein*, 441 F. Supp. 2d 491, 503 (S.D.N.Y 2006) (citation omitted) (stating the statute of limitations for passing-off claims was six (6)

years).  Plaintiff's claim is akin to a misappropriation claim.  The essence of Plaintiff's claim is that Defendant appropriated LEO's commercial advantage and removed it from the market so Defendant's products, like Gateway, could gain an advantage.  Accordingly, the statute of limitations is three (3) years.

Defendant claims Plaintiff's cause of action under Count V accrued when the parties entered into the License Agreement and thereafter developed SBS using LEO, which occurred between 2002 and 2003.  (Doc. # 87, p. 87).  Because Plaintiff did not bring its action until 2011, Defendant contends Plaintiff's claim is time barred.  (*Id*).  Plaintiff claims Defendant's conduct in prohibiting LEO from competition was a continuous tort.  (*See* Doc. # 113, p. 58).  The Court agrees with Plaintiff.  By entering into a ten-year License Agreement, Defendant's alleged unfair competition in prohibiting LEO from the market continued over the life of the License Agreement.  *See Greenlight*, 2005 WL 13682, at *8 (citations omitted) (providing that a plaintiff's claim for trademark infringement was continuous because the defendant continued to use the plaintiff's trademark in the industry).  Therefore, Plaintiff's claim is not time-barred because Defendant's conduct was an alleged continuous tort.

## CONCLUSION

The parties entered into the License Agreement whereby Plaintiff granted to Defendant an exclusive license to Plaintiff's LEO software.  Under the License Agreement, the term "SBS" meant a web-based system owned by Defendant developed using LEO and it did not include Gateway or SERFF.  The parties intended to share Defendant and NIPR's Net Revenue from Exhibit A Electronic Transactions processed in, through, within, or using SBS by a State Insurance Department that signed an SBS License Agreement.  Rate and form transactions were not Exhibit A transactions and Gateway transactions processed in other back-office systems were

not transactions processed in through, within, or using SBS; thus, the parties did not intend to share in those transaction fees. Accordingly, Defendant's Motion as to Count I is GRANTED and Plaintiff's Motion as to Count I is DENIED.

Additionally, the License Agreement required that Defendant reasonably market and exploit SBS as a back-office system. Defendant was not obligated to develop SBS as a front-end system similar to Gateway. Nonetheless, there are genuine issues of material fact as to whether Defendant reasonably marketed and exploited SBS as a back-office system. Additionally, any claim for damages based on Defendant's failure to reasonably market SBS prior to February 14, 2006, is barred by the statute of limitations. Thus, Defendant and Plaintiff's Motions as to Count II are DENIED.

Further, under the License Agreement, NIPR and Defendant were permitted to reduce the price of a transaction fee for any electronic transaction by more than 15% so long as the electronic transaction was not processed in, within, through, or using SBS. Thus, Defendant did not breach the License Agreement when NIPR lowered a transaction fee for Sircon by more than 46% because Sircon is a non-SBS back-office system. Thus, Plaintiff's Motion as to Count III is DENIED. However, there are genuine issues of material fact as to whether there were other Exhibit A Electronic Transactions processed in, within, through, or using SBS where Defendant or NIPR reduced the fee by more than 15% in a calendar year without Plaintiff's consent. Accordingly, Defendant's Motion regarding Count III as it relates to Sircon transactions is GRANTED but as it relates to other transactions with alleged greater-than-15% reductions is DENIED.

Finally, the parties do not dispute that Defendant did not misappropriate LEO to use in Gateway. Defendant's Motion as it relates to Plaintiff's claim that Defendant misappropriated

LEO to use in Gateway is GRANTED.  However, Plaintiff also alleges Defendant entered into the License Agreement to remove LEO from the market so that LEO would not compete with Defendant's products.  Plaintiff has alleged an actionable claim under New York common law for unfair competition.  Further, Plaintiff's unfair competition claim is not barred by the statute of limitations.  Thus, Defendant's Motion as to Count V is DENIED.

**IT IS SO ORDERED.**

        /s/ Gary A. Fenner
       Gary A. Fenner, Judge
       United States District Court

DATED:  May 24, 2013.